**ACTION ALLIANCE OF SENIOR CITIZENS OF GREATER PHILADELPHIA, et al., Appellants,**

v.

**Otis R. BOWEN, et al.**

**No. 87–5251.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 9, 1988.

Decided May 13, 1988.

Burton D. Fretz, with whom Toby S. Edelman and Bruce M. Fried, Washington, D.C., were on the brief, for appellants.

Marleigh D. Dover, Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty. and John F. Cordes, Dept. of Justice, Washington, D.C., were on the brief, for appellees.

Before WALD, Chief Judge, and STARR and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

Opinion dissenting in part filed by Chief Judge WALD.

WILLIAMS, Circuit Judge:

For the second time, we consider a challenge by the Action Alliance of Senior Citizens of Greater Philadelphia and three other senior citizen groups (here referred to collectively as the "Action Alliance") to certain regulations promulgated by the Department of Health and Human Services pursuant to the Age Discrimination Act, Pub.L. No. 94–135, 89 Stat. 728 (1975) (codified as amended at 42 U.S.C. § 6101 *et seq.* (1982)).

The Act generally prohibits recipients of federal funds from discriminating against persons on account of their age with regard to all benefits except employment. It laid out three steps for implementation. First, the U.S. Commission on Civil Rights was to conduct a study to identify instances of age discrimination in federally-funded programs and to report its findings to Congress and the President. 42 U.S.C. § 6106(a). The Commission transmitted its report in January 1978. 43 Fed.Reg. 8,756 (1978).

As the next step, the Act required HHS[1] to promulgate "general" regulations. 42 U.S.C. § 6103(a)(1). These were to serve as a model for "agency-specific" regulations—ones to be issued by the various federal agencies for their own programs, 42 U.S.C. § 6103(a)(4). HHS gave notice of

proposed general regulations in December 1978, 43 Fed.Reg. 56,428 (1978), and promulgated final ones in June 1979, 44 Fed. Reg. 33,776 (1979), codified at 45 C.F.R. Part 90 (1987).

Third, the Act required each agency of the federal government to issue its agency-specific regulations within 90 days of the promulgation of final general regulations. 42 U.S.C. § 6103(a)(4). These were required to be "consistent" with the general regulations, and were to take effect only when approved by the Secretary of HHS. *Id.* HHS, in this respect just another federal agency, proposed its own agency-specific regulations in September 1979, 44 Fed. Reg. 55,108 (1979), and promulgated final ones in December 1982, 47 Fed.Reg. 57,858 (1982), codified at 45 C.F.R. Part 91 (1987).

The Action Alliance filed suit for declaratory and injunctive relief against the Secretary of HHS and the Director of the Office of Management and Budget in February 1983, alleging (1) that the final HHS-specific regulations were inconsistent with the Act, the general regulations, and the proposed HHS-specific rules, and (2) that the defendants had unlawfully failed to approve or act on other agencies' agency-specific regulations. In December 1984, the district court granted the government's motion to dismiss the three HHS-specific claims for want of standing. *Action Alliance of Senior Citizens v. Heckler,* No. 83–0285, slip op. (D.D.C. Mar. 19, 1984) *reprinted in* Joint Appendix ("J.A.") at 43. Nine months later, the district court dismissed the inaction claims as moot; by then the agency had acted. *Action Alliance of Senior Citizens v. Heckler,* No. 83–0285, slip op. (D.D.C. Dec. 28, 1984), *reprinted in* J.A. at 52–60. On appeal, this court affirmed the mootness decision, but reversed the standing determination and remanded the HHS-specific claims. *Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931 (D.C.Cir.1986). On remand, the district court granted summary judgment on the merits in favor of the agency. *Action Alliance of Senior Citizens v.*

---

1. The Act referred to the Department of Health, Education and Welfare, but that was supplanted in 1980 for these purposes by HHS. *See* 20 U.S.C. § 3508 (1982).

*Bowen,* No. 83–0285, slip op. (D.D.C. May 26, 1987), *reprinted in* J.A. at 143–53.

The appeal raises two discrete issues.[2] First, the Action Alliance challenges the agency's decision to strike from the final HHS-specific regulations the mandatory self-evaluation requirement that had been in the general regulations and the proposed agency-specific regulations. HHS responds that its action was obligatory because the Office of Management and Budget had properly eliminated the requirement as unnecessarily burdensome for federal fund recipients, pursuant to the Federal Reports Act, Pub.L. No. 77–381, 56 Stat. 1078 (1942) (codified at 44 U.S.C. § 3501 *et seq.* (1976)). Second, the Alliance argues that HHS's insertion of the phrase "upon request" into the provision requiring recipients to furnish compliance data renders the HHS-specific regulations inconsistent with the general ones. We reject both theories.

## I. THE SELF-EVALUATION PROVISION

█ The final government-wide regulations contained a provision requiring all recipients of federal funds to complete a "written self-evaluation of its compliance under the Act." 45 C.F.R. § 90.43(b) (1987). They required recipients to "identify and justify each age distinction imposed," to "take corrective and remedial action whenever a self-evaluation indicates a violation of the Act," and to "make the self-evaluation available on request to the agency and to the public" for three years. *Id.* The self-evaluation requirement in the HHS-specific regulations proposed by the Secretary in September 1979 closely tracked the government-wide regulation; the only change was to substitute "HEW" (the predecessor agency's abbreviation, *see supra* note 1) for the general term "agency." 44 Fed.Reg. 55,116. The final HHS-

specific regulations, however, gave HHS *discretion* to require self-evaluation in particular cases. It stated:

> As part of a compliance review ... or complaint investigation ... HHS *may* require a recipient ... to complete a written self-evaluation, in a manner specified by the responsible Department official, of any age distinction imposed in its program or activity receiving Federal financial assistance from HHS to assess the recipient's compliance with the Act.

45 C.F.R. § 91.33(b)(1) (emphasis added). HHS explained the change as being

> based upon HHS' determination that to be consistent with the requirements of the Paperwork Reduction Act of 1980, enacted after the publication of the NPRN [sic; NPRM?], the paperwork burden associated with the self-evaluation must be limited to recipients where circumstances indicate ... the need for the self-evaluation.

47 Fed.Reg. at 57,852.

Although this explanation was not false, it left out a few steps. First, between the publication of the proposed HHS-specific regulations in September 1979 and the promulgation of the final regulations in December 1980, the *Office of Management and Budget* had issued a memorandum disapproving of the mandatory self-evaluation requirement contained in the *general regulations.* Second, at that point OMB was in fact not operating under the Paperwork Reduction Act of 1980, Pub.L. No. 96–511, 94 Stat. 2812 (codified at 44 U.S.C. § 3501 *et seq.* (1982) (the "Paperwork Act"), but under its predecessor, the Federal Reports Act, 44 U.S.C. § 3501 *et seq.* (1976) (the "Reports Act"), which was in effect from 1942 until April 1, 1981. But, because of the relation between the Re-

---

**2.** Appellants attempt to raise a third issue on appeal: they contend that the Secretary's *approval* of *other* agencies' agency-specific regulations constitutes an abuse of discretion because those regulations are inconsistent with the Act and/or the general regulations. Appellants' Brief at 34–36.

This issue is not properly before the court at this time. In affirming the district court's mootness determination as to HHS's inaction on the

other agencies' regulations, we noted that appellants could amend their complaint with the district court's permission to add new counts challenging the Secretary's approval of other agencies' regulations. *Action Alliance,* 789 F.2d at 943–44 n. 15. There is no suggestion in the record (or in the appellants' brief) that appellants ever tried to do so. Appellants cannot appeal an issue that was never before the district court.

ports Act and the Paperwork Act, and OMB's role under both, the OMB memorandum compelled HHS's belief that if agency-specific regulations contained mandatory self-evaluation they would neither satisfy the consistency requirement of the Age Discrimination Act nor survive OMB scrutiny under the Paperwork Act.

This is why: The Reports Act denied legal effect to any compulsory agency "collection of information" unless the Director of OMB had approved the proposed collection. 44 U.S.C. § 3509 (1976).[3] The Director could disapprove the proposed collection of information if he or she determined it to be "unnecessary, for any reason." 44 U.S.C. § 3506 (1976).[4] The Director so found in a memorandum issued February 14, 1980. (We deal below with a complaint based on his failure to use the word "unnecessary.")

OMB's issuance of the memorandum of itself negated the general self-evaluation requirement. Two propositions followed. Any universal self-evaluation clause in agency-specific regulations would be most unlikely to win OMB sanction. Under the Paperwork Act (in effect at adoption of the final agency-specific regulations) OMB holds the same substantive power as it did under the Reports Act. Where it determines that collection of information is unnecessary, the agency may not proceed with the collection. 44 U.S.C. § 3508 (1982).[5] Moreover, agency inclusion of such a clause in its own regulations would

seem to violate 42 U.S.C. § 6103(a)(4)'s requirement that agency-specific regulations be "consistent" with the general ones— which since February 1980 lacked any legally effective mandatory self-evaluation clause. (This second point assumes, of course, that § 6103(a)(4)'s "consistency" was to be with the lawful aspects of the general ones, not with clauses promulgated but legally void.)

The Action Alliance nevertheless attacks the final HHS-specific regulation on a number of grounds. Four arguments, all relating to the legality of OMB's disapproval of the self-evaluation requirement, may be disposed of without extended comment.

First, appellants object that the mandatory self-evaluation requirement did not entail a "collection of information" within the meaning of the Reports Act. 44 U.S.C. §§ 3506, 3509 (1976). The clause that OMB nullified, they say, only required recipients to perform a self-evaluation and to "make the self-evaluation available on request to the agency and to the public," 45 C.F.R. § 90.43(b)(4), not to submit the data to the agency. The claim is pure pettifoggery. Appellants cannot seriously believe that in enacting the Reports Act Congress was concerned solely or primarily with private parties' costs of *mailing* data to Washington; it is the record-keeping and data-gathering that constitute the burden. Moreover, OMB and its predecessor, the Bureau of the Budget, have interpreted the statutory term "collection of information" for

---

**3.** 44 U.S.C. § 3509 (1976) provided that "[a] Federal agency may not conduct or sponsor the collection of information ... unless (1) the agency has submitted to the Director [of OMB] the plans or forms, together with copies of pertinent regulations and of other related materials as the Director ... has specified; and (2) the Director has stated that he does not disapprove the proposed collection of information."

**4.** 44 U.S.C. § 3506 (1976) stated that "the Director of [OMB] may determine whether or not the collection of information by a Federal agency is necessary for the proper performance of the functions of the agency or for any other proper purpose.... To the extent, if any, that the Director determines the collection of information by the agency is unnecessary, for any reason, the agency may not engage in the collection of the information."

**5.** 44 U.S.C. § 3508 (1982) provides:
Before approving a proposed information collection request, the Director shall determine whether the collection of information by an agency is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility. Before making a determination the Director may give the agency and other interested persons an opportunity to be heard or to submit statements in writing. To the extent, if any, that the Director determines that the collection of information by an agency is unnecessary, for any reason, the agency may not engage in the collection of information.

nearly half a century to encompass "[a]ny general or specific requirement for the *establishment or maintenance* of records ... which are to be used *or be available for use* in the collection of information." Regulation A, Federal Reporting Services, Clearance of Plans and Reports Forms, Title I(1)(e) (February 13, 1943), *reprinted in* Appendix to HHS Brief ("Regulation A"). Even under the deference we owe the agency, *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984), we doubt we could uphold a view of the Reports Act that made physical delivery to an agency essential to the notion of "collection of information." Happily we confront no such oddity.

Second, appellants note that the Reports Act authorized OMB to bar collection of information only where it found the collection "unnecessary," 44 U.S.C. § 3506 (1976), and object that OMB's memorandum of disapproval did not employ that term. But the Director's memorandum found that HHS had "failed to show the practical utility of the requirement." J.A. at 89. OMB has since 1943 used the "practical utility" standard to determine whether collections of information are "unnecessary," Regulation A, Title II(3)(c), and its regulations specify that "withholding of clearance shall constitute ... a determination in pursuance of section [3506] of the [Reports Act] that the collection of information in the manner proposed is unnecessary," *id.* at Title I(1)(h). OMB pushed the magic button as well as it needed to.

■ Third, appellants claim the existence of an unwritten exception to OMB's power under the Reports Act (and, by implication, the Paperwork Act) for what it calls "duly promulgated legislative rules." Appellants' Reply Brief at 2; *see also* Appellants' Brief at 13–14. We find no basis whatever for this view. The Reports Act contains no suggestion of an exception for legislative rules: on its face it applies to *any* "collection of information" by an agen-

cy. 44 U.S.C. §§ 3506, 3509 (1976); for the Paperwork Act, *see* 44 U.S.C. § 3502(4) (1982). Nor would a "legislative rules" exception further the Reports Act's purpose. Were we to manufacture such an exception, it would allow agencies to circumvent OMB review of burdensome information requirements merely by proposing them as rules published in the Code of Federal Regulations and inviting comment.[6] This outcome would be directly contrary to the Reports Act's goal that OMB ensure that "[i]nformation needed by Federal agencies ... be obtained with a minimum burden upon business enterprises ... and other persons." 44 U.S.C. § 3501 (1976).

The Paperwork Act confirms this view. It assumes that rules entailing collection of information will be adopted pursuant to notice-and-comment rulemaking. *See* 44 U.S.C. § 3504(h)(1) (1982) (requiring agency so proposing to forward a copy to the Director of OMB). Under the Administrative Procedure Act, as Congress obviously knew, such rulemaking exists primarily for "legislative" rules, since most alternatives—interpretive rules or rules of agency procedure—are exempt. 5 U.S.C. § 553(b)(3)(A) (1982). It would be a bizarre anomaly to find a legislative rules exception to the Reports Act now that it has run its course, when its successor plainly contemplates no such exception.

■ The Alliance raises a fourth claim closely related to its proposed legislative rules exception. Noting that the Paperwork Act says that nothing in it shall be "interpreted as increasing or decreasing the authority of the [OMB Director] with respect to the substantive policies and programs of departments ... including the substantive authority of any Federal agency to enforce the civil rights laws," 44 U.S.C. § 3518(e) (1982), it suggests that OMB lacks Paperwork Act authority to restrict data-collection programs undertaken with respect to civil rights laws. But such

---

6. The Reports Act itself made provision for public input into OMB review of information programs. Section 3506 provided in part that, "Before making a determination [of necessity], [the Director of OMB] may give the agency and other interested persons an opportunity to be heard or to submit statements in writing." 44 U.S.C. § 3506 (1976).

a view of § 3518(e) would completely exempt any civil rights activity from OMB's data collection supervision; § 3518(e)'s language is inadequate to carve so large a slice from OMB's authority.

We finally turn to appellants' most interesting challenge. They argue that HHS's change in the self-evaluation provisions created such a gap between the proposed and final HHS-specific rules as to have required HHS to have issued a new notice and opened a new round of comment, in order to comply with the informal rulemaking provisions of the Administrative Procedure Act, 5 U.S.C. § 553(b) (1982). They also claim that HHS's explanation of the change falls short of § 553(c)'s requirement that agencies incorporate in adopted rules "a concise general statement of their basis and purpose."

First we address an ancillary theory. The Alliance argues that HHS illegally modified the *general* regulations without an amending rulemaking. Rule rescissions, it says, are subject to the same requirements as rule adoptions. *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 41, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). The point is indisputable but irrelevant. HHS didn't rescind that part of the general regulations. (In fact, it still has not tidied up the books. The mandatory version is printed in the current edition of the Code of Federal Regulations.) OMB, acting under the Reports Act, drained the mandatory provision of legal effect. Appellants do not even argue that OMB was required to proceed by notice-and-comment rulemaking; their complaint never attacked the general regulations at all. (We note

that under the Paperwork Act OMB's role is fitted into the agency's notice-and-comment procedure. It may comment on proposed data collection rules. If the agency perseveres despite negative OMB comments, OMB may invalidate the collection provision if it finds that the agency's response to its comments was unreasonable. 44 U.S.C. § 3504(h)(5)(C) (1982). But it is not required to initiate a notice-and-comment procedure of its own.)

■ In evaluating whether a change in rules between proposal and final adoption calls for a new round of notice-and-comment,[7] we have long acknowledged practical reality. In *International Harvester Co. v. Ruckelshaus*, 478 F.2d 615 (D.C.Cir. 1973), we recognized that an agency could make changes responding to comments without embarking on a new round. Judge Leventhal observed that a "contrary rule would lead to the absurdity that in rulemaking under the APA the agency can learn from the comments ... only at the peril of starting a new procedural round of commentary." *Id.* at 632 n. 51. This has crystallized in the view that changes from the proposals do not require an additional round where the final rules represent a "logical outgrowth" of the proposals. *See, e.g., Small Refiner Lead Phase–Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C.Cir.1983) (reviewing circuit authority.) As Judge Wald there pointed out, the task is fundamentally one of balancing the advantages of additional comment—improvements in the quality of rules, fairness for affected parties, and facilitation of judicial review—against the burden on "the public

---

7. In this litigation HHS invokes 5 U.S.C. § 553(b)(B), which allows an agency to dispense with *any* notice and comment for "good cause," if its statement of reasons for the rule includes a finding that notice and comment would be "impracticable, unnecessary or contrary to the public interest." We do not rest our decision on § 553(b)(B), however. HHS's statement of reasons did not include the finding described by § 553(b)(B). Although every decision that we can find on the point appears to have held omission of the finding not to be fatal to use of the exception, *see Kollett v. Harris*, 619 F.2d 134, 145 (1st Cir.1980); *Nader v. Sawhill*, 514 F.2d 1064, 1068 (T.E.C.A.1975) (Tamm, J.); *California v. Simon*, 504 F.2d 430, 439 (T.E.C.A.), *cert. denied*, 419 U.S. 1021, 95 S.Ct. 496, 42 L.Ed.2d 294 (1974); *DeRieux v. Five Smiths, Inc.*, 499 F.2d 1321, 1333 (T.E.C.A.), *cert. denied*, 419 U.S. 896, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974), we can find none in this circuit. Here, in any event, the issue is whether the agency was required to initiate a *second* round. We think this more appropriately analyzed under the "logical outgrowth" principle discussed in the text below, adjusted for the presence of a supervening outside force.

interest in expedition and finality." *Id.* at 546–47.

■ Here of course the change arose not from comment on proposals but from a supervening external force—the OMB memorandum. But we have no doubt that the principle applies with the same force here, as it would with a dispositive judicial decision or statutory change. Life is still short, and the interest in getting on with it still weighs against judges forcing agencies through unpromising and unnecessary procedural hoops.

Here we think HHS clearly justified in its implicit view that the plausible benefits of a new round of commentary could not justify the delay. In disapproving the mandatory self-evaluation provision of the general regulations, OMB stated that the "addition of the Age Discrimination Act to the standard assurances used in conjunction with Federal grants and increased publicity of the provisions of the Act" would be "less burdensome and costly" than the proposed one-time self-evaluation. J.A. at 89. It noted also that HHS should have examined methods of "heighten[ing] awareness" of the Act other than "a recordkeeping requirement." *Id.* The comments strongly suggest that OMB would have vetoed any recordkeeping requirement more onerous than the one HHS promulgated in its final agency-specific rules.

Finding error in HHS's failure to open a new round of comment would necessarily rest on an expectation that commenters in such a round would have proposed some recordkeeping requirements more stringent than the one adopted—allowing the agency to demand self-evaluation when appropriate—yet moderate enough to pass OMB scrutiny. It must also assume that this hypothetical middle position would represent some substantial enhancement in HHS's extraction of data from recipients. The appellants' briefs in this case render such expectations implausible. Nowhere there—or at oral argument—have they even hinted at any alternative self-evaluation requirement, much less one with a serious prospect of passing OMB's guardpost.

In its original notice of its proposed agency-specific regulations HHS (really HEW—this was before HEW split into Education and HHS) asked reviewers not to comment on the proposals identical to those in the general regulations, including, of course, the self-evaluation requirement. 44 Fed.Reg. 55,108 (September 24, 1979). This does not alter our view that HHS was free to adopt final rules without a new round of comment. Under the consistency requirement of 42 U.S.C. § 6103(a)(4), HHS's task on that issue was simple conformity to the general regulations—already adopted after full notice and opportunity to comment. Further, quite apart from the ample opportunity afforded by the earlier proceeding, comments made in ignorance of the as-yet unissued OMB memorandum would have shed no light on the options open to HHS after its issuance.

Accordingly we reject appellants' contention that HHS erred in failing to start a second round of notice-and-comment on the self-evaluation issue.

■ Finally, we reject appellants' claim that HHS's explanation of the change fell short of § 553's requirement of a "concise general statement of [the rules'] basis and purpose." We have described above the effect of the OMB memorandum. *See supra* pp. 1452–53. HHS rather telescoped the exact legal connections. The result was indeed very concise and general, but good enough under the circumstances.

## II. THE COMPLIANCE DATA PROVISIONS

■ The government-wide regulations contain a provision directing agencies to include in their agency-specific regulations a requirement that the recipient "[p]rovide to the agency information necessary to determine whether the recipient is in compliance with the Act." 45 C.F.R. § 90.45(a). The corresponding HHS-specific regulation requires recipients to "[p]rovide to HHS, *upon request,* information and reports which HHS determines are necessary to ascertain whether the recipient is complying with the Act and these regulations." 45 C.F.R. § 91.34(b) (emphasis added). The

Alliance contends that HHS's addition of the words "upon request" in its agency-specific rule violates the Act's requirement of consistency with the general regulations. 42 U.S.C. § 6103(a)(4); *see also* 45 C.F.R. § 90.31(d) (similar requirement in general regulations themselves). We disagree.

The problem with the contention is that HHS—the agency that wrote and promulgated the government-wide regulations—has consistently interpreted 45 C.F.R. § 90.45(a) *not* to require agencies to impose a mandatory periodic reporting requirement on recipients. In the explanatory statement that accompanied the final government-wide regulations, it explained § 90.45 as merely *permitting* agency requests:

> To help determine whether a recipient is in compliance with the Act, each Federal agency *may require* its recipients to make their records reasonably accessible to the agency and to furnish information to the agency (§ 90.45).

44 Fed.Reg. at 33,770–71 (emphasis added; the parenthetical citation to § 90.45 appears in the original text of the notice).

The Alliance's reading of § 90.45 to mandate a regular government-wide collection of data seems, by contrast, farfetched. The section specifies neither the type of data to be collected nor the timing nor frequency of collection. As a self-executing mandate, the section is woefully deficient.

Whatever we think of HHS's interpretation, we must defer to it so long as it is not "plainly erroneous or inconsistent with the regulation." *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977); *National Trust for Historic Preservation v. Dole,* 828 F.2d 776, 782 (D.C.Cir.1987); *San Luis Obispo Mothers for Peace v. NRC,* 789 F.2d 26, 30 (D.C.Cir.1986) (en banc), *cert. denied,* —— U.S. ——, 107 S.Ct. 330, 93 L.Ed.2d 302 (1986). As we find it far more plausible than the Alliance's, it handily passes that test.

Appellants argue that HHS's interpretation of 45 C.F.R. § 90.45 cannot be correct because on that view § 90.42 would be superfluous. Even assuming that such an overlap could overcome the controlling weight we give to agencies' interpretations of their own regulations, we do not find the redundancy. Quite simply, the two provisions are directed at different actors. § 90.42 provides that, "A *recipient* ... has responsibility to maintain records, provide information, and to afford access to its records to an agency to the extent required to determine whether it is in compliance with the Act." 45 C.F.R. § 90.42(a) (emphasis added). § 90.45 requires *agencies* to promulgate a regulation asserting the authority to compel the provision of compliance data. The two regulations are distinct enough to accommodate HHS's reading of § 90.45(a).

Once we accept the HHS interpretation of § 90.45(a), the alleged inconsistency between that regulation and § 91.34(b) vanishes. The former requires only that agencies include in their agency-specific regulations a provision obligating recipients to furnish compliance information when requested by the agency; the latter, with its "upon request" clause, fulfills the requirement.

Appellants are left with the argument that the Age Discrimination Act itself *compels* HHS to adopt rules producing annual, government-wide, mandatory collection of information from recipients detailing their compliance with the Act. The argument—so far as we can make it out—goes something like this: (1) 42 U.S.C. § 6106a(a) requires agencies to submit annual reports "containing specific data about program participants or beneficiaries, by age, sufficient to permit analysis" of how well the agency is carrying out the Act's prohibition of age discrimination; (2) § 90.45 was HHS's regulatory response to the requirement; (3) thus § 90.45 must be read to require annual "data collection which is mandatory, uniform, or regular." Appellants' Brief at 30 n. 19. We do not read the Act so broadly. By its own terms § 6106a(a) requires nothing of recipients. Its only stated restriction on the type or amount of data in an agency's report is

that it be "sufficient to permit analysis" of the department's success in defeating age discrimination. This hardly compels the sort of periodic mandatory collection of information the Alliance appears to have in mind.

In any event, HHS when it proposed the general regulations made clear that its response to the report requirement of § 6106a was § 90.34, *not* § 90.45. 43 Fed. Reg. at 56,435–36. § 90.34 reflects what the agency calls "a targeted approach to data collection," *id.* at 56,436/1, and articulates in some detail the required contents of agency reports to HHS under 6106a(a).[8] The "targeted approach" to data collection relies principally on complaint data, as supplemented by "compliance reviews and indepth investigations, as appropriate." 43 Fed.Reg. 56,436/1. In adopting this approach, HHS stated that it believed it to "be more effective than massive reporting systems." *Id.* The Alliance's construction of § 90.45 would impose on all parties just the "massive reporting system" that HHS sought to avoid in meeting § 6106a(a) by the means stated in § 90.34.

In sum, we conclude that 45 C.F.R. § 91.34 is entirely consistent with the general regulations, and that 42 U.S.C. § 6106a does not compel the mandatory collection of compliance data urged by the Alliance.

\*   \*   \*   \*   \*   \*

Finding no merit in appellants' claims, we affirm the judgment of the district court.

*So ordered.*

WALD, Chief Judge, dissenting in part:

I disagree with the majority's conclusion that the Department of Health and Human Services' (HHS) modification of its proposed regulations to implement the Age Discrimination Act (ADA), 42 U.S.C. § 6101, through self-evaluations of ADA compliance by recipients of federal monies, did not require notice and comment pursuant to § 553 of the Administrative Procedure Act (APA). 5 U.S.C. § 553.

The district court correctly held that the self-evaluation provisions are substantive rulemaking that require § 553 public notice and comment. *See* Joint Appendix (J.A.) at 149. HHS (then HEW) fulfilled this requirement when it first proposed the government-wide, mandatory self-evaluation clause on December 1, 1978. *See* 43 *Fed.Reg.* 56,437; 44 *Fed.Reg.* 33,770 (final general regulations published June 12, 1979). However, responding to the Office of Management and Budget's (OMB) memorandum of disapproval (dated February 14, 1980), in its final agency-specific requirements, *see* J.A. at 89, HHS summarily revised the original self-evaluation requirement to make it discretionary with the agency. *See* 47 *Fed.Reg.* 57,858 (codified at 45 C.F.R. § 91). Specifically, HHS confined such discretionary requests to "compliance review[s] or complaint investigation[s]...." *Id.* at 57,852. No notice of the proposed revision, hence no invitation for public comment, was made between the time the agency regulations were proposed and finalized. Indeed, when HHS proposed its agency-specific regulations on September 24, 1979, the public was expressly told *not* to submit comments about the self-evaluation requirement, since it must fol-

---

8. 45 C.F.R. § 90.34 requires each agency to submit to the Secretary of HHS a report which:

(a) Describes in detail the steps taken during the preceding fiscal year to carry out the Act; and

(b) Contains data on the frequency, type, and resolution of complaints and on any compliance reviews, sufficient to permit analysis of the agency's progress in reducing age discrimination in programs receiving Federal financial assistance from the agency; and

(c) Contains data directly relevant to the extent of any pattern or practice of age discrimi-

nation which the agency has identified in any programs receiving Federal financial assistance from the agency and to progress toward eliminating it; and

(d) Contains evaluative or interpretive information which the agency determines is useful in analyzing agency progress in reducing age discrimination in programs receiving Federal financial assistance from the agency; and

(e) Contains whatever other data the Secretary may require.

low the general model. *See* 44 *Fed.Reg.* 55,108 (September 24, 1979).

In general, agencies engaged in rulemaking must signal for notice and comment material changes between the proposed rule and the final rule, above all when those changes are unrelated to the comments received. HHS did not meet this obligation. The majority explains that it is reluctant to force HHS "through unpromising and unnecessary procedural hoops" of notice and comment because the OMB directive had foreclosed any alternatives to the discretionary requirement embodied in the final rule. *See* Majority Opinion at 1456. Yet, although § 553 itself allows agencies to dispense with notice and comment if "good cause" is shown that such proceedings are "unnecessary,"[1] HHS made no such claim here;[2] nor is the futility of allowing notice and comment on the modification apparent from the record.[3] The majority speculates that OMB would have vetoed any more stringent record-keeping requirement than that promulgated, yet OMB's own letter of disapproval is to the contrary. OMB's reasons for its decision that the compulsory requirement could not stand all stress the inadequate commentary and justification for the man-

datory requirement; specifically, OMB criticizes HHS for failing to consider "alternative methods" to the recordkeeping requirement. *See* J.A. at 89. Public comment would have permitted exploration of the "alternative measures" to which OMB alludes, for instance affected persons might have identified for the agency a variety of circumstances or situations when it is most urgent for HHS to require recipients to perform self-evaluations.

Because HHS failed to comply with § 553 when it promulgated its revised agency-specific regulations, and because, unlike the majority, I read the record, and particularly the OMB disapproval order, as supporting, not diminishing, the importance of public participation, I would remand with instructions that HHS seek comment on its proposed modification to the mandatory self-evaluation requirement.

---

1.  5 U.S.C. § 553(b)(B) reads:

    [Notice and comment is not required] when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

2.  In fact, HHS did not even mention the OMB memorandum until appellants-Action Alliance, et al. pointed to its existence in this litigation, four years *after* the HHS actions.

3.  The majority cites *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506 (D.C.Cir. 1983), to suggest that the rule change was the "'logical outgrowth,'" of the proposed rules, hence unworthy of further public proceedings. In the majority's words, "the plausible benefits of a new round of commentary could not justify the delay." *See* Majority Opinion at 1456.

    *Small Refiner* involved quite different circumstances. Whereas the modifications in *Small Refiner* clearly came about in response to public commentary, here the revision is obedience to a single, terse and unpublished OMB disapproval memorandum. And the revision in this case

has weighty consequences. Under the first proposal, HHS was compelled to require recipients of federal monies to perform self-evaluations; yet under the HHS-specific regulations, HHS has discretion never to order any evaluations, which the record shows has indeed been HHS's policy. Additionally, at the preceding HHS rulemaking stage, from which the revised rules are said to be a logical outgrowth, the public was expressly told *not* to submit comments; similarly, the affected public had no input into the OMB memorandum decision. The majority's fear of a delaying "new round" of commentary is ironic: The affected public has yet to be allowed its first round.

The logical outgrowth exception to § 553, which assumes prior, comprehensive public participation, is thus inapposite. None of *Small Refiner's* three purposes underlying § 553 was satisfied here: (1) the revised regulation was not "'tested by exposure to diverse public comment,'" 705 F.2d at 547 (citing *BASF Wyandotte Corp.*, 598 F.2d 637 at 641); (2) senior citizen groups were unfairly silenced in forming the eventual regulations; (3) and the omission of notice and comment has compromised the evidentiary record for review, as is manifest in the confused chronology and sparse reasoning underlying this provision. *See id.*