IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 90-4484

---

ANN RHYNE,

                                        Plaintiff-Appellant,

versus

HENDERSON COUNTY, ET AL.,

                                        Defendants-Appellees.

---

Appeal from the United States District Court
for the Eastern District of Texas

---

(     September 14, 1992   )

Before GOLDBERG, HIGGINBOTHAM, and DAVIS, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

Ann Rhyne brings this action against Henderson County and its sheriff, Charlie Fields, in his official capacity, under 42 U.S.C. § 1983, alleging that the County's failure to provide her son, Paul Morrow, with reasonable medical care resulted in his suicide.[1] Rhyne appeals a directed verdict and dismissal of state-law claims. We find no substantial evidence that Henderson County failed to provide the medical care required by the United States Constitution

---

[1]The other defendants, the City of Athens, David Harris, police chief of the City of Athens, Lakeland Medical Center, have been dismissed from the case, and Ann Rhyne does not appeal their dismissal.

and affirm.  We also affirm the dismissal of Rhyne's state-law claims.

I.

On Friday afternoon, May 30, 1986, Henderson County deputy sheriff Jim Ellis arrested Paul Morrow and took him to Henderson County jail.  At 3:30 a.m., the deputy jailer on duty, Kevin Harris, found Morrow hanging semi-conscious from the cell bars by a make-shift rope that he had fashioned from a jail blanket in his cell.

Morrow was taken to Lakeland Medical Center in Athens, Texas by ambulance.  While Morrow was at Lakeland, he telephoned his mother and told her that he had attempted to commit suicide and would try to kill himself again.  Morrow was also examined by Dr. David Callanan, who concluded that Morrow was a suicide risk. Lakeland, however, lacked psychiatric facilities and Athens police returned Morrow to Henderson County jail at about 5:30 a.m.

After Morrow returned to jail, Harris removed Morrow's clothes except for his underwear and cuffed his hands to a waistband belt to prevent further suicide attempts.  Harris also placed Morrow in a "book-in" cell close to the front of the jail where he could be carefully watched and removed all blankets and mattresses from the cell.

At 6:00 a.m., after Harris had been relieved by Deputy Jailer DeWitt Loven, Chief Jailer Dennis Benton arrived at the jail. Benton transferred Morrow to the misdemeanor tank and placed him in a strait jacket.  At about 7:25 a.m., Benton and Loven heard an

2

inmate yell that Morrow was trying to kill himself. Morrow had removed his strait jacket and had attempted to hang himself with the jacket.

On the advice of Chief Sheriff's Deputy Maureen Padgitt, Benton called Henderson County Mental Health and Mental Retardation to conduct a mental evaluation of Morrow and try to send him to a hospital. Thomas Tinsley, the director of mental health at MHMR, visited the jail at 8:30 a.m. and, after examining Morrow, concluded that he should be committed to Rusk State Hospital on an "emergency warrant" for psychological evaluation. Tinsley possessed signed emergency warrants authorizing the emergency detention of convicts at Rusk State Hospital for 24 hours on a weekday and 72 hours on a weekend. Tinsley testified that the County Court supplied him with such warrants, because it had delegated to him the power of transferring convicts to Rusk in a temporary emergency.

However, after talking to Deputy Sheriff Ellis, Tinsley learned that Morrow had charges pending against him. The warrants in Tinsley's possession, according to Tinsley's testimony at trial, could not be used to commit pre-trial detainees. Morrow could not be committed without a warrant, because Rusk State Hospital "could not confine someone without some formal court order telling them to." According to both Tinsley and Deputy Sheriff Padgitt, the Sheriff's office could not transfer Morrow without a court order, because the Sheriff's Office lacked authority to drop the charges against Morrow.

3

Therefore, Tinsley advised Benton to maintain Morrow in custody until Monday and then obtain a court order through the District Attorney's office authorizing Morrow's transfer to the maximum security unit at Rusk State Hospital. He apparently believed that Morrow could be transferred for an evaluation of his competence to stand trial. Tinsley also advised that Morrow be watched carefully until Monday. Morrow promised Tinsley that he would not attempt to take his life again, but Tinsley left the jail with misgivings, fearing further attempts at suicide.

After Tinsley left, Benton gave Morrow a blanket because Morrow, still wearing nothing but his underwear, seemed cold. The officers did not put the strait jacket back on Morrow, and he was not put into the "book-in" cell in the front of the jail. Rather, he was put into the misdemeanor tank, which was not clearly visible from the front desk. Saturday morning passed uneventfully at the jail. At some time during the morning, County Court Judge Winston Reagan called the jail and spoke with Loven, the deputy jailer on duty. Loven could not recall what was said during this call. However, Loven did not mention Morrow's two suicide attempts to the County Court judge.

Saturday morning was not so tranquil for Rhyne. Distraught from her conversation with her son when he was at Lakeland, she consulted with an attorney at 11:00 a.m. in an effort to have Morrow committed to an institution where he could receive proper psychiatric care. When visiting hours began at 1:00 p.m., Rhyne visited Morrow in jail with her daughter, Ann Griffin. Morrow

4

cried during their interview and declared once more that he would try to kill himself again. There is a factual dispute as to whether either Griffin or Rhyne informed any jail employee that Morrow had repeated his threat to kill himself.

Rhyne also called the Henderson County jail and asked Deputy Jailer Loven for advice as to how Morrow could be transferred from the jail to a hospital. Loven advised her to call Judge Winston Reagan with whom he had spoken earlier that morning. Rhyne explained that she had called the Judge at his home but that the Judge's wife informed her that he was at the courthouse. Rhyne asked Loven to help her reach Judge Reagan, but Loven declined. Loven testified at trial that

"I could not take a stand [because] not being a psychologist, I could not say the boy was mentally disturbed or not. There was just nothing for me that I could legally do other than point her in the right direction on how to go through the legal steps to get it done."

Loven's notes recording his conversation with Rhyne stated that he told her that "if I took any stand in the matter Paul could sue me." After failing to obtain any assistance from Loven, Rhyne decided to wait at her home until 9:00 p.m. when Judge Reagan was due to arrive back at his house.

Events on Saturday evening, however, made Judge Reagan's arrival moot. At about 7:15 p.m., Deputy Jailer Kluth heard an inmate yell "he's doing it again." Kluth discovered Morrow once more hanging from the prison bars by a strip of the jail's blanket given to Morrow by Benton. Morrow was unconscious. Rhyne was

informed of this suicide attempt at 8:00 p.m. Morrow died in a Tyler hospital nine days later, having never revived from his coma.

## II.

The County contends that Rhyne cannot recover for her son's wrongful death under § 1983 unless she proves that the County acted with specific intent to deprive her of a familial relationship. Otherwise, the argument continues, Rhyne would lack standing, because she would have suffered no personal injury in her own right as a result of the County's alleged violation of her son's constitutional rights.

Rhyne does not seek to recover as a representative of her son's estate for the injuries that her son incurred. There has been no administration of her son's estate, and she has not brought this action in her representative capacity. Rather, Rhyne seeks to recover for her own injuries arising out of the wrongful death of her son. The right to such recovery under § 1983 has "generated considerable confusion and disagreement," Crumpton v. Gates, 947 F.2d 1418, 1420 (9th Cir. 1991), over which the circuits have divided. Compare Jaco v. Bloechle, 739 F.2d 239, 243 (6th Cir. 1984) and Bell v. City of Milwaukee, 746 F.2d 1205 (7th Cir. 1984). The Supreme Court has yet to decide this question. See Steven H. Steinglass, Wrongful Death Actions and Section 1983, 60 Ind. L. J. 559, 565 (1985).

This court first addressed the issue of wrongful death recovery under § 1983 in Brazier v. Cherry, 293 F.2d 401, 409 (5th Cir. 1961). In Brazier, a widow sued for the wrongful death of her

husband, allegedly beaten to death by a County Sheriff and other police officers.  The widow sought damages to compensate the estate for injuries incurred by her husband.  She also sought compensation for the pecuniary loss that she suffered from her husband's death.  Brazier, 293 F.2d at 402 n.1.  This court held that 42 U.S.C. § 1988 incorporated both Georgia's survival statute and Georgia's wrongful death statute to provide full remedies for violations of constitutional rights.  Id. at 409.

The Brazier court reasoned that, unless the decedent's cause of action survived his death, the remedies provided by § 1983 would fail when the injury is death.  Id. at 407-09.  The court concluded that such an anomalous result indicated that the remedies under § 1983 were deficient without the support of state law.  The court held that § 1983 incorporated Georgia's wrongful death and survival statutes as remedies under § 1983.  Id.

Much of Brazier's discussion concerned the survival of the decedent's claim, as opposed to the widow's right to recover for her own injuries arising out of her husband's death.  However, the court held that both Georgia's wrongful death and survival statutes were incorporated into federal law under § 1988, stating

> "Since Georgia now provides both for survival of the
> claims which the decedent had for damages sustained
> during his lifetime as well as a right of recovery to his
> surviving widow and others for homicide, . . . we need
> not differentiate between the two types of actions.  To
> make the policy of the Civil Rights Statutes fully
> effectual, regard has to be taken of both classes of
> victims.  Section 1988 declares that this need may be
> fulfilled if state law is available.  Georgia has
> supplied the law."

Brazier, 293 F.2d at 409.

7

In Grandstaff v. City of Borger, 767 F.2d 161, 172 (5th Cir. 1985), this court allowed a father to recover for the loss of society and companionship incurred by the wrongful death of his son. In reaching this result, the Grandstaff court stated simply that "[w]e look to Texas law for guidance on the damages recoverable for [plaintiff's son's] death." Id. As Judge Garwood's dissent in Grandstaff noted, the plaintiff in Grandstaff was not recovering damages that were a "rough proxy for the deceased's damages" but rather was recovering damages for an injury that the parent suffered in his own right. Grandstaff, 767 F.2d at 173 n.* (Garwood, J., dissenting).

Under Brazier and Grandstaff, Rhyne has standing to recover for her own injuries arising out of the wrongful death of her son. There is no dispute that Rhyne is within the class of people entitled to recover under Texas law for the wrongful death of a child. See Tex. Civ. Prac. & Rem. § 71. Both Brazier and Grandstaff hold that § 1988 incorporates this wrongful death remedy into § 1983, allowing Rhyne to recover under § 1983 for her own injuries resulting from the deprivation of her son's constitutional rights.

Henderson County contends that Rhyne cannot have standing unless she proves that the County intended to deprive her of her familial association with her son in adopting those policies that led to her son's death, pointing to Trujillo v. Bd. of County Commissioners, 768 F.2d 1186 (10th Cir. 1985). The Trujillo court held that the mother and sister of the decedent could not recover

8

under § 1983 for Trujillo's wrongful death unless they proved that the defendants had been motivated by an intent to interfere with the Trujillos' right of familial association in unconstitutionally causing Richard Trujillo's death.  Id. at 1190. The Trujillo court, therefore, affirmed the district court's dismissal of the § 1983 action.

We recognize the strength of the argument that, unlike survival statutes, wrongful death statutes arguably create new causes of action and therefore ought not to be incorporated by § 1988.  See Jaco, 739 F.2d at 242-43; Martin A. Schwartz & John E. Kirklin, 1 Section 1983 Litigation:  Claims, Defenses, and Fees, 730-31 (2nd ed. 1991).  But see Berry v. City of Muskogee, 900 F.2d 1489, 1504-05 & n.21 (10th Cir. 1990) (noting that wrongful death statutes "create new causes of action in the most technical sense" but that they are essentially remedial, to enforce "substantive right . . of decedent"); Steinglass, Wrongful Death Actions, 60 Ind. L.J. at 620-21 (suggesting that the "better view is that courts should be able to use § 1988 to incorporate state wrongful death actions in § 1983").  We also acknowledge that allowing suit by the parent in her own right is not an inevitable companion of a wrongful death statute.  At the same time, Texas wrongful death law provides Rhyne with the right to recover for her son's wrongful death and she can recover for injury to herself caused by her son's death.  To be more precise, our decisions allow recovery by Rhyne for her injury caused by the state's deprivation of her son's constitutionally secured liberty interests.  We need not say more

9

here because Rhyne was not entitled to go to the jury on the question of whether there was a constitutional violation, as we will explain.

III.

We apply <u>Boeing v. Shipman</u>, 411 F.2d 365, 374-75 (5th Cir. 1969) (en banc), viewing the directed verdict. We find no substantial evidence of a deliberately indifferent policy of Henderson County that deprived Morrow of reasonable medical care.

Rhyne alleges that Henderson County deprived her son of the medical care required by the due process clause of the Fourteenth Amendment. Pre-trial detainees are entitled to a greater degree of medical care than convicted inmates. They must be provided with "reasonable medical care, unless the failure to supply it is reasonably related to a legitimate government objective." <u>Cupit v. Jones</u>, 835 F.2d 82, 85 (5th Cir. 1987); <u>Boston v. Lafayette County, Mississippi</u>, 744 F. Supp. 746, 752 (N.D. Miss. 1990).

The failure to provide pre-trial detainees with adequate protection from their known suicidal impulses is actionable under § 1983 as a violation of the detainee's constitutional rights. <u>Burns v. City of Galveston, Texas</u>, 905 F.2d at 104; <u>Partridge v. Two Unknown Police Officers of Houston</u>, 791 F.2d 1182, 1188 (5th Cir. 1986). There is no dispute about Morrow's suicidal tendencies. He had attempted suicide twice and had been diagnosed by Dr. Callanan as suicidal. Mr. Tinsley, the director of the County MHMR, had recommended that Morrow be sent to Rusk State Hospital because he was a high suicide risk.

10

There is also little question that a jury could find that the jail staff was negligent in their care of Morrow. Despite Morrow's obvious suicidal tendencies, the jail staff placed Morrow alone in a cell where he could not be continuously observed. They also unwittingly gave him the tool he used to hang himself.

Rhyne, however, cannot prevail by showing that the jail staff failed to provide reasonable medical care. The suit is against Henderson County.[2] Rhyne must show that the County violated her son's constitutional rights.

A municipality, of course, can act only through its human agents, but it is not vicariously liable under § 1983. Oklahoma City v. Tuttle, 471 U.S. 808, 817-18, 105 S.Ct. 2427, 2433 (1985) (plurality); Monell v. Department of Social Services, 436 U.S. 658, 691 (1978); Benavides v. County of Wilson, Texas, 955 F.2d 968, 972 (5th Cir. 1992). Henderson County can be held liable for its non-policy-making employees' acts only if its employees were carrying out Henderson County's policies when they acted. City of Canton, Ohio v. Harris, 109 S.Ct. 1197, 1205-06 (1989). Therefore, Rhyne may recover under § 1983 only if she shows that some County custom or policy caused the Henderson County jail staff to deprive her son of reasonable medical protection from his own suicidal tendencies. Burns v. City of Galveston, Texas, 905 F.2d 100, 102 (5th Cir. 1990).

---

[2]The action against Sheriff Fields in his official capacity is an action against the County. Kentucky v. Graham, 473 U.S. 159 (1985).

11

A municipal "policy" must be a deliberate and conscious choice by a municipality's policy-maker. City of Canton, Ohio v. Harris, 109 S.Ct. 1197, 1205 (1989) (quoting Pembaur v. City of Cincinnati, 106 S.Ct. 1292, 1300 (1986) (plurality)). While the municipal policy-maker's failure to adopt a precaution can be the basis for § 1983 liability, such omission must amount to an intentional choice, not merely an unintentionally negligent oversight. City of Canton, 109 S.Ct. at 1204; Manarite v. City of Springfield, 957 F.2d 953, 959 (1st Cir. 1992).

The Supreme Court has held that municipal failure to adopt a policy does not constitute such an intentional choice unless it can be said to have been "deliberately indifferent." City of Canton, 109 S.Ct. at 1205. A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights. Id. Consider, for example, a municipality that arms its officers with firearms, knowing to a moral certainty that the armed officers will arrest fleeing felons. The municipality would be deliberately indifferent in failing to train the officers properly in the use of deadly force, because the likelihood of unconstitutional consequences of the municipality's omission is obvious. Id. at 1205 n.10.

With these principles in mind, we examine the policies accused by Rhyne. We find the evidence insufficient to create a jury question concerning whether Henderson County acted with deliberate indifference in adopting policies regarding care of inmates known

12

to be suicidal. Put another way, a reasonable juror could not find that Henderson County adopted policies creating an obvious risk that pre-trial detainees' constitutional rights would be violated.

Rhyne describes four County policies that caused the jail staff to fail to provide her son with reasonable medical care. First, she contends that the Sheriff failed to adopt a policy of continuously observing suicidal inmates, making their suicide more likely. Second, Rhyne argues that the County did not adequately train the jail staff to provide reasonable medical care for detainees. Third, she argues that the County had a policy of relying on the County MHMR or detainees' relatives to obtain the necessary paperwork. Finally, Rhyne argues that the County acted with deliberate indifference in relying exclusively on Rusk State Hospital to provide psychiatric care for inmates.

The record is insufficient to support a jury question as to the existence of a policy of inadequate training for the jail staff. Admittedly, the staff's behavior on the weekend of Morrow's suicide did not reflect skill and good judgment: the staff failed to place Morrow in a cell where he would be readily visible, and Chief Jailer Benton provided Morrow with the blanket with which Morrow eventually hanged himself. However, there was no evidence presented at trial concerning the level of training that the staff possessed, the additional training they lacked, or why it would be obvious that a constitutional violation would result from the absence of the latter. There was also no evidence that any incompetence was the result of inadequate training. Absent such

13

evidence, we cannot find a genuine fact question concerning the existence of a policy of inadequate training. Benavides v. County of Wilson, 955 F.2d 968, 972 (5th Cir. 1992).

We also cannot find evidence sufficient to create a jury question that the County's failure to provide continuous observation of known suicidal inmates constituted a deliberately indifferent method of conducting suicide watches. We assume arguendo that the jury could find from the evidence that Henderson County's policy was not to place known suicidal inmates under continuous observation but rather to check up on them every five to ten minutes.

However, even if the jury could conclude that Henderson County's policy did not involve continuous observation of suicidal inmates, there is no evidence that such a policy was deliberately indifferent. The County was not indifferent in the literal sense of the word to the known risk of suicide: its policy, according to testimony on which Rhyne relies, was to check on suicidal inmates every ten minutes--about six times as often as non-suicidal inmates were checked. This effort indicates not apathy, but concern. Rellergert v. Cape Girardeau County, Missouri, 924 F.2d 794, 797 (8th Cir. 1991).

The periodic checks may have been inadequate. See Lindsay M. Hayes, And Darkness Closes In: A National Study of Jail Suicides, 10 Crim. Just. & Behav. 461, 482 (1983) ("Inmates exhibiting suicidal behavior should be placed in the general population of the jail and/or kept under 24-hour 'eye contact' supervision").

14

Arguably the jury might conclude that the Sheriff was negligent in not requiring more continuous observation, but that, of course, is not enough under § 1983. Absent evidence that frequent periodic checks were obviously inadequate, we cannot find a jury question as to deliberate indifference.

There was no such evidence. Rhyne produced no evidence of suicide attempts at the Henderson County jail that would have alerted the Sheriff to the need for more frequent suicide checks. There was also no evidence of objective jail standards requiring continuous watches as opposed to checks every ten minutes. The difference between frequent periodic checks and "continuous observation" is one of degree. Without evidence showing that the higher level of care was obviously necessary, we cannot see how the jury could conclude that the lower level of surveillance was deliberately indifferent.

We find no jury question as to whether Henderson County's failure to obtain commitment orders for pre-trial detainees is deliberately indifferent. We assume arguendo that the jury could find that Henderson County had a policy of refraining from obtaining such orders, instead relying on the County MHMR or the inmates' parents to deliver the needed emergency warrant for commitment. However, there was no substantial evidence that such a policy would obviously lead to the violation of pre-trial detainees' constitutional right to reasonable medical care.

It is significant that Sheriff Field's policy was not simply to ignore the needs of suicidal inmates. On the contrary, the

15

undisputed evidence shows that the Sheriff had a policy of taking affirmative steps to obtain psychiatric care for jail inmates. He arranged to have the County MHMR examine suicidal inmates, make recommendations about their treatment, and obtain court orders for inmates in need of commitment. Unfortunately, on the weekend of Morrow's suicide, Mr. Tinsley had access only to court orders for the commitment of convicts, not pre-trial detainees. The reliance on the County MHMR in this particular case, therefore, had the apparently unforeseen consequence of impeding Morrow's access to Rusk State Hospital.

The reliance on MHMR to commit suicidal inmates, by itself, raises no question of deliberate indifference. Commitment to mental institutions may deprive inmates of constitutionally protected liberty interests. Vitek v. Jones, 445 U.S. 480, 491-94 (1980). Jail staff lacking psychiatric training might understandably be wary of applying to the courts directly to place an inmate in a mental institution--even an obviously suicidal inmate like Paul Morrow. Benavides, 955 F.2d at 975 (Sheriff is not deliberately indifferent in relying on doctors' certification of jailers' fitness for police work).

After Tinsley informed the deputies that he lacked the court orders needed for commitment of pre-trial detainees, the deputies arguably should have taken the initiative in contacting a judge to commit Morrow. Their failure to do so may have been the result of Sheriff Fields' failure to install a back-up mechanism for obtaining court commitment orders. Arguably, Sheriff Fields was

16

negligent in failing to anticipate that MHMR might be unable to obtain warrants for the emergency commitment of pre-trial detainees.

However, absent some evidence--past experience with suicidal inmates, past failure of MHMR, objective jail standards, etc.--that MHMR would obviously be unable to deliver the required court orders on request, the Sheriff's failure to provide such a back-up process cannot be described as a deliberate policy choice.  Rhyne failed to provide such evidence.  There was no evidence that MHMR had ever failed to deliver commitment orders when needed in the past.  There was also no evidence that any prisoner had ever committed suicide at the Henderson County jail because he could not be moved promptly to Rusk State Hospital.  At most, Rhyne's evidence raises a fact question as to whether the Sheriff had been guilty of a negligent oversight.  Such negligence cannot be the basis for § 1983 liability.

Rhyne contends that the County irrationally distinguished between pre-trial detainees and convicts.  According to Rhyne, the County had a policy of obtaining emergency warrants for convicts but not for pre-trial detainees.  However, this inference is unwarranted, because there is no evidence that Sheriff Fields or any other jail personnel were aware, prior to the weekend of Morrow's suicide, that MHMR could obtain emergency warrants only for convicts and not for pre-trial detainees.  The evidence shows, at most, that Henderson County deliberately relied on MHMR to obtain the needed paperwork without providing a back-up system for

17

obtaining the needed process and that this reliance misfired in the individual case of Paul Morrow.

Rhyne finally argues that Henderson County was deliberately indifferent to pre-trial detainees' reasonable medical needs because it relied exclusively on Rusk State Hospital for inmate psychiatric care. Rhyne argues that reliance on Rusk State Hospital was deliberately indifferent because Rusk State Hospital required commitment orders before it would accept jail inmates for psychiatric treatment. This argument is essentially a restatement of her argument that Henderson's County's failure to obtain commitment orders was deliberately indifferent. Given that there was no deliberate indifference in failing to obtain the court order, ipso facto there can be no deliberate indifference in relying on a hospital that required the court order.

IV.

In addition to her § 1983 claim, Rhyne brought what was then a pendent state-law claim against the County under the Texas Tort Claims Act, Tex. Civ. Prac. & Rem. Code § 101.001 et seq., alleging that Henderson County was responsible for the wrongful death of her son because of their negligent use of County property--the sheet, blanket, and jail facilities used by Morrow in his suicide. The district court dismissed Rhyne's pendent state-law claims without prejudice, giving as a reason only that "[t]he Court exercises its discretion in declining to consider the pendent state law claims."

Federal court jurisdiction over pendent state-law claims is now governed by 28 U.S.C. § 1367, which provides that

18

> "in any civil action in which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

28 U.S.C. § 1367(a) (West Supp. 1992). Under § 1367(c)(3), "the district court may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--. . . (3) the district court has dismissed all claims over which it has original jurisdiction."

The district court has properly dismissed all of the federal questions that gave it original jurisdiction in this case. Therefore, we find that the district court's dismissal of the state-law claims was proper under 28 U.S.C. § 1367(c)(3).

AFFIRMED.

GOLDBERG, Circuit Judge, concurring specially:

> *"Experience is the name everyone gives to their mistakes."*[3]

I concur in Judge Higginbotham's well-written, well-reasoned, opinion because I too agree that the plaintiff's case suffered from critical evidentiary deficiencies. Plaintiff did not sustain her burden of proving that <u>this</u> defendant-municipality acted with <u>deliberate</u> indifference towards the mental health needs of pretrial detainees. These jail officials undertook commendable efforts to provide, what they believed to be, reasonable mental health care.

---

[3] Oscar Wilde, <u>Lady Windmere's Fan</u>, Act III (1892).

Their efforts fell short, and, as a result, a man in their custody succeeded in taking his own life.

Fortunately, the policymakers in charge can learn from their mistakes and take the necessary additional steps to insure the safety of pretrial detainees in need of mental health care.  Other municipalities should also take heed of the tragic consequences which are likely to ensue in the absence of adequate safety measures to deal with detainees displaying suicidal tendencies.[4]

What we learn from the experiences of Henderson County is that when jailers know a detainee is prone to committing suicide, a policy of observing such a detainee on a periodic, rather than on a continuous, basis, will not suffice;[5] that vesting discretion in

---

[4]  Ours is not the first case involving a detainee suicide. See, e.g., Bowen v. City of Manchester, --- F.2d ---, 1992 WL 119837 (1st Cir. June 5, 1992); Barber v. City of Salem, 953 F.2d 232 (6th Cir. 1992); Simmons v. City of Philadelphia, 947 F.2d 1042 (3d Cir. 1991); Colburn v. Upper Darby Township, 946 F.2d 1017, 1022, 1030 (3d Cir. 1991); Rellergert v. Cape Girardeau County, 924 F.2d 794, 797 (8th Cir. 1991) Buffington v. Baltimore County, 913 F.2d 113 (4th Cir. 1990); Popham v. City of Talladega, 908 F.2d 1561 (11th Cir. 1990); Lewis v. Parish of Terrebonne, 894 F.2d 142 (5th Cir. 1990); Cabrales v. County of Los Angeles, 846 F.2d 1454 (9th Cir. 1988), reinstated, 886 F.2d 235 (9th Cir. 1989), cert. denied, 110 S.Ct. 1838 (1990); Partridge v. Two Unknown Police Officers of Houston, 791 F.2d 1182 (5th Cir. 1986).

[5]  See Simmons, 947 F.2d 1042, 1071 n.28 (3d Cir. 1991) (opinion of Becker, J.) ("[T]he City's police directives concerning the fifteen minute checks, the double celling of detainees, and the removal of personal articles do not, in and of themselves, preclude the City's constitutional liability for a policy or custom tainted by deliberate indifference."); Lewis, 894 F.2d at 145 (evidence was sufficient to support jury verdict that warden was deliberately indifferent when he placed detainee in solitary confinement knowing that detainee had suicidal tendencies and should not be left alone); cf. Colburn v. Upper

untrained jail personnel to assess the need for, and administer, mental health care, will not be responsive to the medical needs of mentally ill detainees;[6] and that delegating the task of providing mental health care to an agency that is incapable of dispensing it on the weekends will endanger the well-being of its emotionally disturbed detainees.[7]   We need not remind jailers and municipalities that the Constitution works day and night, weekends and holidays -- it takes no coffee breaks, no winter recess, and no summer vacation.

So the plaintiff in this case did not prove that Henderson County adopted its policy of handling suicidal detainees with deliberate indifference to their medical needs.  But that does not

---

Darby Township, 946 F.2d 1017, 1022, 1030 (3d Cir. 1991) (no deliberate indifference where detainees monitored continuously by means of a video camera and a closed circuit television); Rellergert v. Cape Girardeau County, 924 F.2d 794, 797 (8th Cir. 1991) (no deliberate indifference where "policy used by the Sheriff's office ... represent[ed] affirmative and deliberate steps to prevent suicides by subjecting suicidal inmates to nearly constant watch.").

[6]   Cf. Colburn, 946 F.2d at 1022, 1030 (municipal policy not deliberately indifferent because detainees were provided with any necessary medical attention, and a crisis intervention officer, trained to handle emergency situations including suicides, was on call during each shift); Cabrales v. County of Los Angeles, 846 F.2d 1454, 1461 (9th Cir. 1988) (medical understaffing at the jail amounted to a policy of deliberate indifference), reinstated, 886 F.2d 235 (9th Cir. 1989), cert. denied, 110 S.Ct. 1838 (1990).

[7]   See Cabrales, 846 F.2d 1454 at 1461 ("Access to medical staff has no meaning if the medical staff is not competent to deal with the prisoners' problems."); cf. Colburn, 946 F.2d at 1022, 1030 (no deliberate indifference where trained personnel were on call during every shift).

insulate Henderson County, or any other municipality, from liability in future cases. Jailers and municipalities beware! Suicide is a real threat in the custodial environment. Showing some concern for those in custody, by taking limited steps to protect them, will not pass muster unless the strides taken to deal with the risk are calculated to work: Employing only "meager measures that [jailers and municipalities] know or should know to be ineffectual" amounts to deliberate indifference.[8] To sit idly by now and await another, or even the first, fatality, in the face of the Henderson County tragedy, would surely amount to deliberate indifference.

Comforted somewhat, and certainly hopeful, that jailers and municipalities everywhere can learn from the mistakes of Henderson County, I concur.

---

[8] See Simmons, 947 F.2d at 1071 n.28 (rejecting the dissent's position that "the implementation of some measures intended to reduce the risk of suicides in the City's lockups negates the possibility that the City policymakers could be found to have been anything more than negligent in addressing the medical needs of ... suicidal detainees.").