REVISED - October 2, 2000

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

**No. 99-30185**

**SHEILA STOCKSTILL JACOBS, Deceased; ANTHONY**
**JULIUS LAFORTE, Son of Sheila Stockstill Jacobs; and**
**CHRISTOPHER LOFORTE,**

**Plaintiffs-Appellees,**

**VERSUS**

**WEST FELICIANA SHERIFF'S DEPARTMENT, et al.,**

**Defendants,**

**BILL DANIEL; EARL REECH; and WAYNE RABALAIS,**

**Defendants-Appellants.**

Appeal from the United States District Court
For the Middle District of Louisiana

September 13, 2000

Before KING, Chief Judge, and GARWOOD and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

In this section 1983 claim brought by the sons of a woman who committed suicide as a pretrial detainee in a Louisiana jail, Defendants-Appellants, West Feliciana Sheriff Bill Daniel, Deputy

Earl Reech, and Deputy Wayne Rabalais have filed this interlocutory appeal from the denial of their motion for summary judgment based on qualified immunity. For the reasons discussed below, we dismiss this appeal as it relates to claims against Sheriff Daniel in his official capacity, we affirm the denial of qualified immunity for Sheriff Daniel and Deputy Reech, and we reverse the denial of qualified immunity for Deputy Rabalais.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On August 21, 1996, Sheila Jacobs was arrested for the attempted, second-degree murder, by shooting, of her uncle. Jacobs had become enraged at her uncle when she learned that he had allegedly sexually molested one of her sons years before. The arresting state troopers informed an investigator for the West Feliciana Sheriff's Department that Jacobs told them shortly after her arrest that, after shooting her uncle, she had tried to kill herself by placing a loaded gun in her mouth and pulling the trigger, but the gun had jammed. The investigator conveyed this information to Sheriff Daniel.

Sheriff Daniel and Deputy Rabalais both testified that they were, indeed, told that Jacobs had attempted suicide shortly before her arrest. After processing Jacobs, the officers at the West Feliciana Parish Prison placed Jacobs in a "detox" cell, which is used to house inmates who are intoxicated, who need to be isolated

2

for safety reasons, or who are designated for placement on a suicide watch. According to Deputy Rabalais's deposition testimony, when Jacobs was placed in the detox cell, the officers had her on suicide watch and had placed a note to that effect in the control center. The various defendants testified that the detox cell could be constantly observed from the jail's control room through a window, but that a substantial portion of the cell, including the bunk area, fell into a "blind spot," and was not visible from the control room. This cell could be completely observed only if an officer viewed it from the hallway. The cell also had several "tie-off" points (bars and light fixtures from which a makeshift rope could be suspended), despite Sheriff Daniel's acknowledgment that a suicide prevention cell should not have such tie off points and despite the fact that another inmate, James Halley, had previously committed suicide in the very same cell by hanging himself with a sheet from one of these tie-off points. To the best of Deputy Rabalais's knowledge, and pursuant to Sheriff Daniel's directive, Jacobs was not given sheets on the first night of her detention, August 21.

On the morning of August 22, Jacobs appeared before a Louisiana state district judge, who appointed attorney Clayton Perkins to represent her. The next morning, Friday, August 23, Perkins visited Jacobs at the jail. Perkins requested that Sheriff Daniel leave Jacobs in the detox cell, and perhaps provide her with a blanket and towel. Sheriff Daniel instructed one of his deputies

3

to give these items to Jacobs, but the record reflects only that Jacobs received a sheet (which she eventually used to kill herself), and there is no evidence that she received either a towel or a blanket. In his report, Sheriff Daniel stated that he had been thinking about moving Jacobs to another cell with other female detainees, but decided to leave her in the detox cell after she asked him not to move her because she was afraid the other women would hurt her. He also noted that Jacobs had asked for her hepatitis medication and had given no other indications that she was planning to attempt suicide or to harm herself.

Deputies Reech and Rabalais were on duty at the West Feliciana jail facility from 11:30 p.m. the night of August 23, until 7:30 a.m. the next morning, August 24. The record reveals that the defendants still regarded Jacobs as a suicide risk during that time. Indeed, Sheriff Daniel testified that Jacobs was on a "precautionary," though not a "straight" suicide watch. Our review of the record reveals few discernable differences between these two types of suicide watches. When an inmate was on "strict" suicide watch, the informal policy at the jail was to have the inmate checked on every fifteen minutes. Deputy Reech testified that he and Deputy Rabalais made periodic checks on Jacobs; however, it is unclear exactly how often the deputies checked on Jacobs while she was under the "precautionary" suicide watch. What is clear is that as many as 45 minutes elapsed from the time a deputy last checked on Jacobs to the time she was discovered hanging from the light

4

fixture in the detox cell.

Specifically, the record reveals that, after having observed Jacobs in the detox cell at 12:22 a.m. and 1:00 a.m., Deputy Reech checked on Jacobs at 1:22 a.m., and he observed her lying awake in her bunk. At 2:00 a.m., Deputy Rabalais went to investigate some loud music down the hall, and on his way back to the control station, he observed Jacobs lying awake in her bunk. Deputy Rabalais testified that both he and Deputy Reech checked on Jacobs sometime between 2:00 and 2:44 a.m., and that Jacobs was still awake in her bunk. After this last check, Deputy Reech returned to the jail lobby to read his newspaper. At approximately 2:44 a.m., Deputy Rabalais looked into the detox cell from the control room and saw what appeared to be part of an arm hanging from the ceiling. Concerned, he went to find Deputy Reech, who was still reading the newspaper, to help him get into the detox cell. When the deputies arrived at the cell, they found Jacobs hanging from a sheet that had been tied around the caging surrounding a ceiling light fixture. Deputy Rabalais found a knife and enlisted the assistance of another inmate in cutting the sheet and lowering Jacobs onto the floor. By all indications, Jacobs had torn a small string from the bunk mattress and wrapped that string around the sheet to form a make-shift rope. The paramedics who arrived only moments later were unable to resuscitate Jacobs. Jacobs's suicide was the third suicide at the jail during Sheriff Daniel's tenure there. As noted above, James Halley's suicide had occurred in the

5

same cell where Jacobs killed herself. The third suicide had occurred in a cell down the hallway from the detox cell.

On July 8, 1997, Anthony LaForte commenced this action in the Eastern District of Louisiana. The case was transferred to the Middle District, which includes the Parish of West Feliciana. On April 6, 1998, Jacobs' other son, Christopher LoForte,[1] was added as a plaintiff. The plaintiffs' amended complaint alleged a violation of section 1983 by the Parish of West Feliciana, the West Feliciana Parish Sheriff's Department, Sheriff Daniel, in his individual and official capacities, and Deputies Reech and Rabalais, in their individual capacities. The plaintiffs asserted that the individual defendants violated Jacobs's rights under the Fourteenth Amendment by exhibiting deliberate indifference to her obvious suicidal tendencies and failing to protect her from self-inflicted harm. They also contended that Sheriff Daniel in his official capacity, violated Jacobs' Fourteenth Amendment rights by failing to implement a suitable policy for accommodating the medical and psychiatric needs of pretrial detainees like Jacobs. On January 26, 1998, the case was transferred to a magistrate judge and the parties consented to disposition by a magistrate judge pursuant to 28 U.S.C. § 636(c). On August 31, 1998, Sheriff Daniel, Deputy Reech, and Deputy Rabalais, moved for summary judgment, claiming qualified immunity with respect to the claims

---

[1] We have retained the seemingly inconsistent spellings of the sons' last names which appear in the record before us.

asserted against them in their individual capacity.  Additionally

the defendants claimed that the medical/psychiatric accommodation

policy for pretrial detainees was constitutionally sufficient to

defeat the claim asserted against Sheriff Daniel in his official

capacity.  The Magistrate Judge conducted a hearing on October 16,

1998, and on January 19, 1999, denied the motion.  The individual

defendants have now timely filed this interlocutory appeal from the

denial of summary judgment on grounds of qualified immunity.


## II.  DISCUSSION

### A.  Jurisdiction

As a preliminary matter, we must consider whether we have

jurisdiction to hear this appeal.  "Normally, we do not have

appellate jurisdiction to review a district court's denial of a

motion for summary judgment because such [an order] is not a final

one within the meaning of 28 U.S.C. § 1291."  *Lemoine v. New*

*Horizons Ranch and Center, Inc.,* 174 F.3d 629, 633 (5th Cir. 1999).

There is an exception to this rule, however, when a summary

judgment motion is based on an official's claim of absolute or

qualified immunity and the district court's disposition is premised

upon a legal conclusion, and not simply a dispute with regard to

the sufficiency of the evidence.  *See* *id.* (citing *Mitchell v.*

*Forsythe*, 105 S. Ct. 2806 (1985)).  The district court's order in

this case states that the defendants' conduct was not objectively

7

reasonable in light of the applicable legal standard of deliberate indifference. Accordingly, we have interlocutory appellate jurisdiction to review the denial of the defendants' motion for summary judgment, but only insofar as the denial considered the viability of the defendants' qualified immunity defense, which defense is applicable only to the claims against Sheriff Daniel, Deputy Reech, and Deputy Rabalais in their individual capacities.

We are without jurisdiction to review the denial of the defendants' summary judgment motion regarding Sheriff Daniel in his official capacity. Municipal governments may not raise immunity defenses on interlocutory appeal. *See* **Nicoletti v. City of Waco**, 947 F.2d 190, 191 (5th Cir. 1991) (citing **McKee v. City of Rockwell**, 877 F.2d 409, 412 (5th Cir. 1989)). And since a suit against Sheriff Daniel in his official capacity is a suit against the Parish, we may not review the Magistrate Judge's denial of summary judgment regarding Sheriff Daniel in his official capacity. For these reasons, we must dismiss this appeal as it relates to the claim against Sheriff Daniel in his official capacity. The district court's decision that the individual defendants are not entitled to immunity will be reviewed on the merits.

**B. The Individual Capacity Claims**

We review a denial of summary judgment based on a claim of qualified immunity de novo, and consider all evidence in the light most favorable to the nonmovant. *See* **Blackwell v. Barton**, 34 F.3d

8

298, 301 (5th Cir. 1994). To determine whether an official is entitled to qualified immunity, we must determine: (1) whether the plaintiff has alleged a violation of a clearly established constitutional right; and (2) if so, whether the defendant's conduct was objectively unreasonable in light of clearly established law at the time of the incident. *See **Hare v. City of Corinth***, 135 F.3d 320, 325 (5th Cir. 1998) (citing ***Colston v. Barnhart***, 130 F.3d 96, 99 (5th Cir. 1997)).[2]

Regarding the first inquiry, the plaintiffs have stated a claim under currently applicable law for the denial of Jacobs's substantive due process rights. Unlike convicted prisoners, whose rights to constitutional essentials like medical care and safety are guaranteed by the Eight Amendment, pretrial detainees look to the procedural and substantive due process guarantees of the Fourteenth Amendment to ensure provision of these same basic needs. *See **Bell v. Wolfish***, 99 S. Ct. 1861 (1979). A pretrial detainee's due process rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner." ***Hare II***, 74 F.3d at 639 (citing ***City of Revere v. Massachusetts Gen. Hosp.***, 103 S.

---

[2]  We pause here to identify the three ***Hare*** decisions which are referenced in this opinion. The original panel opinion in ***Hare v. City of Corinth***, 22 F.3d 612 (5th Cir. 1994) is referred to as ***Hare I***; our en banc review of that panel opinion in ***Hare v. City of Corinth***, 74 F.3d 633 (5th Cir. 1996)(en banc) is referred to as ***Hare II***; and the second panel opinion, ***Hare v. City of Corinth***, 135 F.3d 320 (5th Cir. 1998), which followed the remand ordered by our en banc opinion, is referred to as ***Hare III***.

9

Ct. 2979, 2983 (1983)). In **Hare II**, which was a somewhat factually analogous prison suicide case, we observed that "the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement." **Id.** at 650.

The plaintiffs have alleged that the individual defendants were deliberately indifferent to Jacobs's obvious need for protection from self-inflicted harm. It is well-settled in the law that "a state official's episodic act or omission violates a pretrial detainee's due process rights to medical care [and protection from harm] if the official acts with subjective deliberate indifference to the detainee's rights." **Nerren v. Livingston Police Dep't**, 86 F.3d 469, 473 (5th Cir. 1996) (citing **Hare II**, 74 F.3d at 647-48).[3] By alleging deliberate indifference to Jacobs's clearly established Fourteenth Amendment rights, the plaintiffs have cleared the first hurdle in defeating the defendants' qualified immunity defense.

The second part of our qualified immunity analysis is to

---

[3] The claim against the individual defendants is properly analyzed as an "episodic act or omission" case, as opposed to a "condition of confinement" case. *See* **Scott v. Moore**, 114 F.3d 51, 53 (5th Cir. 1997) (en banc) ("In an 'episodic act or omission' case, an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act or, or omission by, the actor and then derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission.").

determine whether the defendants' conduct was objectively unreasonable in light of clearly established law at the time of Jacobs's suicide. As noted above, we have observed that at least since 1989, it has been clearly established that officials will only be liable for episodic acts or omissions resulting in the violation of a detainee's clearly established constitutional rights if they "had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk." *Hare II*, 74 F.3d at 650; *see also Flores v. County of Hardeman,* 124 F.3d 736, 738 (5th Cir. 1997) ("A detainee's right to adequate protection from known suicidal tendencies was clearly established when Flores committed suicide in January 1990."). Thus, we must hold the defendants to the standard of subjective deliberate indifference in determining whether their conduct was objectively reasonable. *See Hare III*, 135 F.3d at 327. The determination of the objective reasonableness of particular conduct in light of the subjective deliberate indifference standard is a question of law for the court. *See id.* at 328. In *Hare III*, we explained the somewhat confusing relationship between the deliberate indifference and objective reasonableness standards as follows:

> . . . for [an] appeal on qualified immunity, the subjective deliberate indifference standard serves only to demonstrate the clearly established law in effect at the time of the incident . . . . And under that standard–the minimum standard not to be

11

> deliberately indifferent—the actions of the individual defendants are examined to determine whether, as a matter of law, they were objectively unreasonable.

*Hare III*, 135 F.3d at 328. In other words, we are to determine whether, in light of the facts as viewed in the light most favorable to the plaintiffs, the conduct of the individual defendants was objectively unreasonable when applied against the deliberate indifference standard. *See id.* at 329.

In denying the defendants' motion for summary judgment regarding the individual capacity claims, the Magistrate Judge first found that for purposes of summary judgment, Sheriff Daniel and the two deputies all had subjective knowledge that Jacobs posed a serious risk of suicide throughout her confinement. Specifically, the Magistrate Judge found that the defendants had placed Jacobs on some kind of suicide watch, that she remained classified as being a suicide risk at all relevant times, and that a reasonable jury could infer from this evidence that they regarded her as a suicide risk until the moment she killed herself. The Magistrate Judge found that despite this subjective knowledge, the defendants:

> "(1) placed Jacobs in a detox cell that purportedly permitted constant observation from the control room but which in fact had a substantial ‹blind spot;’ (2) allowed her to have loose bedding (to be used in the ‹blind spot,’ i.e., the bunk) despite defendants’ admission that this was not advisable for a potentially suicidal person; (3) allowed the loose bedding in a cell that had multiple ‹tie-off’ points despite Sheriff Daniel’s acknowledgment that

12

> a suicide prevention cell should not have tie-off
> points and despite one of the still-uncorrected tie
> off points having been used in a prior suicide; and
> (4) left Jacobs essentially unobserved for an as
> yet undetermined period of time, up to three
> quarters of an hour, in violation of Sheriff
> Daniel's unwritten policy of quarter-hour checks.
> Deputy Reech, who apparently had the keys to the
> cell block, was reading a newspaper in the lobby."

According to the Magistrate Judge, all of these factors precluded a finding that the defendants' conduct was objectively reasonable in light of the deliberate indifference standard.

The case law from our own and from our sister circuits offers little guidance for determining whether the defendants' particular actions toward Jacobs were objectively unreasonable in light of their duty not to act with deliberate indifference toward a known suicide risk. In *Hare III*, we noted that "'while . . . the law is clearly established that jailers must take measures to prevent inmate suicides once they know of the suicide risk, we cannot say that the law is established with any clarity as to what those measures must be.'" *Hare III*, 135 F.3d at 328-29 (quoting *Rellergert v. Cape Girardeau County*, 924 F.2d 794, 797 (8th Cir. 1991)). It is well-settled, however, "that *negligent* inaction by a jail officer does not violate the due process rights of a person lawfully held in custody of the State." *Hare II*, 74 F.3d at 645 (citing *Davidson v. Cannon*, 106 S. Ct. 668, 671 (1986)) (emphasis supplied). Accordingly, to be considered deliberately indifferent to a known suicide risk, an officer's acts must constitute at least

13

more than a mere "oversight." *See* **Lemoine**, 174 F.3d at 635 (noting that "oversight" in administration at juvenile behavior modification camp where deceased plaintiff died of heatstroke was not sufficient to demonstrate anything more than negligence and therefore qualified immunity was appropriate). Indeed, to defeat qualified immunity, the plaintiffs must establish that the officers in this case were aware of a substantial and significant risk that Jacobs might kill herself, but effectively disregarded it. *See* **Farmer v. Brennan**, 114 S. Ct. 1970, 1984 (1994).

While the Magistrate Judge evaluated the conduct of the three defendants collectively, we note that Sheriff Daniel and his deputies did not act in unison at every moment Jacobs was in the jail. Accordingly, prudence and our own precedent dictates that we examine each individual defendant's entitlement to qualified immunity separately. *See* **Stewart v. Murphy**, 174 F.3d 530, 537 (5th Cir. 1999) (in a section 1983 action, the conduct of each defendant who has been sued in his individual capacity should be examined separately).

### i.  Sheriff Daniel

The record before us reveals that Sheriff Daniel was aware that Jacobs had tried to kill herself once before and that she posed a serious risk of trying to do so again. Throughout the time Jacobs was in the jail, Sheriff Daniel considered her to be a suicide risk. Under Sheriff Daniel's supervision, Jacobs was

14

placed in the detox cell, which had a significant blind spot and tie-off points, despite the fact that during Sheriff Daniel's tenure another detainee, James Halley, had committed suicide in the same cell by hanging himself from one of the tie-off points. Specifically, Halley tied a blanket around one of the bars in the window of the detox cell and hung himself by fashioning the secured blanket around his neck and sitting down. Deputy Reech, and not Sheriff Daniel, initially ordered Jacobs to be placed in the detox cell. Nevertheless, Sheriff Daniel effectively ratified that decision by keeping Jacobs in the cell while he considered her to be a significant suicide risk. Moreover, Sheriff Daniel ordered his deputies to give Jacobs a blanket and towel, despite the fact that he still knew that she was a suicide risk. He did not offer any reason for doing so other than Jacobs's appointed counsel's suggestion that she be given these items, and in fact, he acknowledged that a suicidal person should not have loose bedding of any kind in a cell with them. Sheriff Daniel also acknowledged that it was not advisable to place a suicidal detainee in a cell with tie-off points, even though the detox cell had tie-off points. We note also that with full awareness that a prior suicide occurred in the detox cell by way of an inmate securing a blanket to a tie-off point therein, Sheriff Daniel did nothing to eliminate or conceal the tie off points in the detox cell, which cell Sheriff Daniel's own unwritten policy mandated as the appropriate cell for housing suicidal detainees.

15

Of course, Sheriff Daniel did not completely ignore Jacobs's suicidal condition, and in fact instituted some preventative measures, including not allowing Jacobs to have loose bedding during the first day and a half of her detention and instituting more frequent checks on her. However, those measures are not be enough to mitigate his errors and, overall, his conduct was objectively unreasonable in light of his duty not to be deliberately indifferent. Indeed, based on our review of other pretrial detainee suicide cases, we conclude that there is sufficient evidence in this record for a jury to conclude that Sheriff Daniel acted with deliberate indifference to Jacobs's known suicidal tendencies. *See* **Hare III**, 135 F.3d at 329 (examining other pretrial detainee suicide cases as "backdrop of the deliberate indifference" standard when considering whether individual defendants might be entitled to qualified immunity).

In **Rhyne v. Henderson County**, 973 F.2d 386 (5th Cir. 1992), an official capacity case addressing the merits of a deliberate indifference claim, we found that a county and its sheriff were not liable under section 1983 for the suicide of a pretrial detainee even though the jail officials gave the detainee, who had already attempted suicide twice, a blanket, and failed to keep him under constant supervision. *See* **id.** at 393. Yet **Rhyne** actually supports our conclusion that Sheriff Daniel's conduct was not objectively reasonable. In **Rhyne**, we concluded that the county policies did

16

not exhibit deliberate indifference because there was no evidence that those policies were "obviously inadequate." *See id.* at 392-93 ("A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights."). Additionally, in *Rhyne*, there was no evidence such as past suicides at the jail, "that would have alerted the Sheriff to the need for more frequent suicide checks." *Id.* at 393. Here, by contrast, Sheriff Daniel knew that placing a clearly suicidal detainee in a cell with tie-off points and a blind spot was "obviously inadequate." These accommodations became even more inadequate when one of the deputies, at Sheriff Daniel's direction, supplied Jacobs with loose bedding. Our holding in *Rhyne* suggests that the evidence of Sheriff Daniel's conduct could support a jury finding of deliberate indifference.

The two cases relied on by the defendants are distinguishable and do not support a finding of qualified immunity for Sheriff Daniel. In *Flores v. County of Hardeman*, 124 F.3d 736 (5th Cir. 1997), a sheriff initially placed Flores, a pretrial detainee, on suicide watch because he was acting strangely, but after twelve hours discontinued the watch because Flores seemed to be doing better. Flores was then given a blanket and checked every hour; later, he hung himself with the blanket. We found that the sheriff had not acted with subjective deliberate indifference because

17

Flores did not give any indication of suicidal tendencies at the time he killed himself. *See id.* at 738-39. Unlike that kind of situation, where "nothing the [detainee] did so clearly indicated an intent to harm himself that the [officers] caring for him could have only concluded that he posed a serious risk of harm to himself," *Sibley v. Lemaire*, 184 F.3d 481, 489 (5th Cir. 1999), in this case, Sheriff Daniel was fully aware that Jacobs had actually attempted suicide once before, regarded her as a suicide risk at all times during her detention, and yet still placed her in the detox cell and ordered loose bedding to be given to her.

In *Hare*, Tina Hare, a pretrial detainee, threatened suicide and was moved to an isolation cell nearest to a camera. *See Hare II*, 74 F.3d at 637. One of the officers took away her shoes and belt, but left her a blanket, believing erroneously that she was not strong enough to tear it into a size suitable for harming herself. Hare was in fact strong enough, and hung herself with strips of the blanket. *See id.* at 637-38. A panel of our Court in *Hare III* found that the officers were entitled to qualified immunity because their conduct was "within the parameters of objective reasonableness," as measured by the subjective deliberate indifference standard. *See Hare III*, 135 F.3d at 329. However, *Hare III* is distinguishable on the basis that the officer in that case gave Hare the blanket in the reasonable, though mistaken, belief that she was not strong enough to hurt herself with it. In

18

this case, the only reason Sheriff Daniel had for ordering that Jacobs be given a blanket and towel was that her attorney requested it, and that is insufficient to excuse Sheriff Daniel's decision. Sheriff Daniel still regarded Jacobs as a suicide risk and would have been well within his rights to decline the attorney's request on those grounds. Additionally, in **Hare III**, there was no evidence, as there is in this case, that the jailers were aware of a prior suicide by means similar to those made available to the suicidal detainee, in the very same defective and unaltered cell, in which the prior suicide victim was housed.

Sheriff Daniel knew that Jacobs exhibited a serious risk of suicide and placed her in conditions he knew to be obviously inadequate. He then ordered, without reasonable justification, that she have a blanket and towel, even though he knew that those items should not be in the hands of a seriously suicidal detainee. We would find it difficult to say that this behavior could not support a jury finding that Sheriff Daniels acted with deliberate indifference, and likewise we find it even more difficult to say that this conduct was objectively reasonable. For these reasons, as well as for substantially the same as those reasons given in the Magistrate Judge's order denying summary judgment, we affirm the denial of qualified immunity for Sheriff Daniel as to claims asserted against him in his individual capacity.

### ii. Deputy Reech

19

Deputy Reech was the senior deputy on duty when Jacobs killed herself. Like Sheriff Daniel and Deputy Rabalais, he had actual knowledge that Jacobs was a suicide risk at all times during her detention.[4] He also knew about the earlier hanging suicide of James Halley in the detox room, and with respect to the Halley and Jacobs suicides, Reech deposed that there was nothing they (at the jail) could do to stop the detainees from killing themselves if they wanted to and that it wasn't their responsibility. Despite this knowledge, and the fact that nothing had been done to correct either the blind spot or the tie-off points in the detox cell, Deputy Reech ordered Jacobs to be placed in it for a suicide watch. Like Sheriff Daniel, Deputy Reech was on notice that these facilities were "obviously inadequate."

We note that it was Sheriff Daniel, not Deputy Reech, who made the decision that Jacobs be given a blanket. The fact that Reech did not make the decision that Jacobs should have a blanket would seem to militate in favor of finding qualified immunity, since after all, if no blanket had ever been provided, it would not have made any difference which cell he had placed her in. On the other hand, Deputy Reech did observe Jacobs lying on the bunk in the detox cell several times during the period when she had the sheet, and despite his awareness that a prior suicide occurred in the

---

[4] Though he claims not to have been notified that Jacobs was on a suicide watch, he conceded that she was placed, by him, in the detox cell "probably" as a precautionary measure given her risk of suicide.

20

detox cell using a blanket and that suicidal inmates should not be given lose bedding, he did not take the sheet away from Jacobs. Additionally, Deputy Reech did not check on Jacobs as frequently as he was supposed to.

Given Deputy Reech's level of knowledge about the significant risk that Jacobs would attempt to harm herself and his disregard for precautions he knew should be taken, we conclude that there is enough evidence in this record from which a reasonable jury could find subjective deliberate indifference. And in light of Deputy Reech's failure to insure that adequate precautions were taken to protect Jacobs from her known suicidal tendencies, we find that Deputy Reech's conduct falls outside the realm of that which could be characterized as being objectively reasonable in light of the duty to not act with subjective deliberate indifference to a known substantial risk of suicide.

### iii. Deputy Rabalais

Based on the summary judgment evidence, we conclude that no reasonable jury could find that Deputy Rabalais, who had only been on the job for about six months at the time of Jacob's death, acted with deliberate indifference, and we further find that his conduct, in light of the record evidence, was objectively reasonable, thus entitling him to qualified immunity from suit in his individual capacity. While Deputy Rabalais, like his co-defendants, had actual knowledge that Jacobs was a suicide risk at all times during

her confinement, he did not make the decision to place her in the detox cell.  As noted above, Deputy Reech, the senior deputy on duty with over twenty years of experience, made that decision. Deputy Rabalais likewise had nothing to do with the order that Jacobs be given a blanket and towel, which order was evidently interpreted by some unknown jail official as entitling Jacobs to a loose sheet instead.

In all the events leading up to the evening of Jacobs's death, Deputy Rabalais was essentially following orders.  Additionally, there is no evidence that Deputy Rabalais knew about the Halley suicide in the detox cell, and he cannot be said to have been on the same notice as Sheriff Daniel or Deputy Reech that the facility was "obviously inadequate."  In light of his more limited knowledge, and the fact that the orders he received from his two superiors were not facially outrageous, Rabalais acted reasonably in following them.

The only element of Jacobs's detention over which Deputy Rabalais had direct control was the frequency with which he checked on her.  Like Deputy Reech, Deputy Rabalais did not comply with Sheriff Daniel's unwritten policy of checking on Jacobs every fifteen minutes.  However, this failure to abide by Sheriff Daniel's policy alone evinces at best, negligence on the part of Deputy Rabalais, which is insufficient to support a finding of deliberate indifference.  *See **Hare II***, 74 F.3d at 645-46.  In light

22

of the foregoing, we conclude that Deputy Rabalais conducted himself in an objectively reasonable manner with respect to his duty to not act with subjective deliberate indifference to the known risk that Jacobs might have attempted suicide, and that as a result, the Magistrate Judge erred in denying his motion for summary judgment on grounds of qualified immunity.

## III. CONCLUSION

As a result of the foregoing analysis, we dismiss this appeal as it relates to the official capacity claims asserted against Sheriff Daniel for a lack of interlocutory appellate jurisdiction, we affirm in part the Magistrate Judge's order to the extent that it denies summary judgment on grounds of qualified immunity on the individual capacity claims asserted against Sheriff Daniel and Deputy Reech, and we reverse in part the Magistrate Judge's order to the extent it denies summary judgment on grounds of qualified immunity on the individual capacity claims asserted against Deputy Rabalais and we remand to the district court for entry of judgment in his favor.

**APPEAL DISMISSED IN PART, AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**