# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-50194

United States Court of Appeals
Fifth Circuit

**FILED**

April 26, 2019

Lyle W. Cayce
Clerk

MARIA ARENAS, Individually,

> Plaintiff–Appellant,

versus

JOHN CALHOUN, in His Individual Capacity,

> Defendant–Appellee.

Appeals from the United States District Court
for the Western District of Texas

Before HIGGINBOTHAM, SMITH, and HIGGINSON, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

While patrolling the administrative segregation unit of a state prison, Officer John Calhoun saw that inmate Richard Tavara was hanging from a noose around his neck with a bedsheet suspended from the ceiling sprinkler head. Because he was unable to see Tavara's feet through the small window in the cell door, Calhoun could not tell whether Tavara was actually hanging and in need of medical assistance or was staging suicide to draw officers into

the cell for an ambush. Instead of rushing into a potentially dangerous situation, Calhoun immediately summoned backup and waited for his supervisor to determine when it was safe to open the door. By the time the officers entered the cell nearly seven minutes later, Tavara was dead.

Maria Arenas sued Calhoun in his individual capacity under 42 U.S.C. § 1983, claiming that he had violated her son's Eighth Amendment right against cruel and unusual punishment. The district court granted summary judgment for Calhoun. Because his actions did not amount to deliberate indifference, we affirm.

## I.

Tavara struggled with severe depression throughout his twenty-four years. He dropped out of high school, had trouble sleeping, and often refused to eat. After he attempted suicide in 2008 by cutting himself, Tavara was diagnosed with bipolar disorder and hospitalized for about six weeks. He moved to Georgia to work on a construction project with his brother and, while there, was convicted of robbery by intimidation and sentenced to three years in prison.

Tavara stood five feet, five inches tall and weighed 150 pounds. He had no incarcerations, gang affiliation, or violent disciplinary history. Upon entering the Georgia Department of Corrections ("GDOC"), he received a routine physical and mental health examination. The psychologist found that Tavara had not taken any medication in the past two years and appeared stable. As a result, he was classified as a "Level I" mental health inmate, indicating that no mental health services were necessary. When Tavara was transferred to Smith State Prison, the intake sheet showed that he had no chronic medical problems, was taking no medications, and was not a mental health patient.

In December 2014, Tavara complained of chest pains and was examined

No. 18-50194

by medical staff. Having refused to go to the hospital or return to the general-population dormitory, he was temporarily placed in administrative segregation pending further investigation. The following evening, Calhoun was in charge of monitoring Tavara's cellblock. Standing five feet, eleven inches tall and weighing 180 pounds, Calhoun was equipped with a stab-proof vest and a can of pepper spray. Calhoun had never seen Tavara before his shift and knew nothing of his mental issues or why he had been placed in administrative segregation.

At about 10:49 p.m., Calhoun discovered Tavara with the noose around his neck.[1] Though the noose appeared "pretty tight," Calhoun was unable to see Tavara's feet through the small window in the cell door. Because Tavara might have been standing on a bed or a pile of books, Calhoun could not be sure whether the apparent suicide was genuine or feigned. Rather than rush head-long into a precarious situation, Calhoun immediately made four radio calls for assistance. Upon being assured that help was on its way, Calhoun retrieved the key to Tavara's cell from the control room. Unbeknownst to Calhoun, how-ever, the officer at the control room had mistakenly handed him the wrong key. Over the next few minutes, Calhoun paced the cellblock and completed some paperwork while awaiting backup.

At around 10:54, Sergeant Mark Shelby appeared and began to yell and pound on the cell door in an effort to get Tavara to respond. When Officer Adam Haas came about ten seconds later, Calhoun returned to his desk to fetch the key that he had inadvertently left there. Lieutenant Marvin Dickson then arrived, assessed the scene, and ordered the cell door opened. After unsuc-cessfully trying to unlock the door, Calhoun realized he had the wrong key and

---

[1] The sequence and timing were captured in a surveillance video and are largely undisputed.

3

No. 18-50194

ran to the control room to collect the correct one.[2]  Nearly seven minutes after Calhoun first saw Tavara hanging, the officers finally entered the cell.  They removed Tavara from the noose, attempted CPR, notified emergency medical services, and videotaped their actions in accordance with prison policy.  But by then, it was too late to resuscitate Tavara.

Arenas sued in the Western District of Texas, where Calhoun was then residing.  As proof of deliberate indifference to her son's serious medical needs, Arenas alleged Calhoun had flouted a GDOC standard operating procedure that requires an officer to "call for backup . . . and then immediately cut down the hanging inmate . . . and initiate CPR procedures."  GA. DEP'T OF CORR., STANDARD OPERATING PROCEDURES VG68-0001, at 12 (2005).  Calhoun insisted that the policy was inapplicable and that he was instead required to wait for at least one other officer before entering Tavara's cell.

Calhoun filed a motion to dismiss, which the district court denied.  After discovery, Calhoun moved for summary judgment on the underlying merits and on the basis of qualified immunity ("QI").  The court granted summary judgment for Calhoun because, before that evening, he had lacked subjective knowledge of a substantial risk to Tavara's life.  Additionally, the court held that Calhoun's response to the suicide did not amount to deliberate indifference but was, at most, grossly negligent.

II.

We review a summary judgment *de novo*, applying the same standards as the district court.  *Milton v. Tex. Dep't of Criminal Justice*, 707 F.3d 570, 572 (5th Cir. 2013).  We construe all facts and inferences in the light most

---

[2] Arenas estimates that mistake caused a standstill of nine seconds, whereas Calhoun figures the delay at twenty seconds.

4

No. 18-50194

favorable to the nonmovant. *Id.*

The Eighth Amendment prohibits "cruel and unusual punishments." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1123 (2019). Originally it was understood to "proscribe tortures and other barbarous methods of punishment" but was extended to ban "punishments which are incompatible with the evolving standards of decency that mark the progress of a maturing society" or "involve the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976) (cleaned up). Though the "Constitution does not mandate comfortable prisons," "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and . . . take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citations and internal quotation marks omitted).

To prevail on an Eighth Amendment claim, an inmate must establish two elements. First, he must demonstrate that the alleged deprivation was objectively serious, exposing him "to a substantial risk of serious harm" and resulting "in the denial of the minimal civilized measure of life's necessities."[3] Second, an inmate must prove that the official possessed "a subjectively culpable state of mind"[4] in that he exhibited "deliberate indifference to serious medical needs."[5]

"Deliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). A prison official displays deliberate indifference only if he (1) "knows that inmates face

---

[3] *Farmer,* 511 U.S. at 834 (citations and internal quotation marks omitted); *see also Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006); *Herman v. Holiday*, 238 F.3d 660, 664 (5th Cir. 2001).

[4] *Farmer*, 511 U.S. at 846 n.9; *see also Herman*, 238 F.3d at 664.

[5] *Gamble*, 429 U.S. at 106.

a substantial risk of serious bodily harm" and (2) "disregards that risk by failing to take reasonable measures to abate it." *Gobert*, 463 F.3d at 346 (quoting *Farmer*, 511 U.S. at 847). Medical treatment that is merely unsuccessful or negligent does not constitute deliberate indifference, "nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances."[6] Rather, an inmate "must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'"[7]

Suicide is an objectively serious harm implicating the state's duty to provide adequate medical care. *See Hare v. City of Corinth*, 74 F.3d 633, 644 (5th Cir. 1996) (en banc). Calhoun acknowledges that he knew Tavara faced a substantial risk of harm upon seeing him with a ligature around his neck. Thus, the only question is whether Calhoun "effectively disregarded" the known risk that Tavara might kill himself.[8]

## A.

Calhoun did no such thing. Within seconds of observing Tavara's plight, Calhoun placed four radio calls for assistance. He then obtained the key and awaited the arrival of the promised support. It is true that help did not appear for roughly five minutes. But entering the dormitory alone would have jeopardized Calhoun's personal safety and that of the prison itself. As Calhoun

---

[6] *Gobert*, 463 F.3d at 346 (citations omitted); *see also Farmer*, 511 U.S. at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.").

[7] *Domino*, 239 F.3d at 756 (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)). *Accord Gibson v. Collier*, 920 F.3d 212, 219–21 (5th Cir. 2019).

[8] *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 395 (5th Cir. 2000) (citing *Farmer*, 511 U.S. at 846–48).

well knew, prisoners occasionally stage injuries or other emergencies to lure responding officers into their cell.[9]  That is especially so for inmates housed in administrative segregation.  Because such inmates are often removed from the general prison population for committing an act of violence or other disciplinary infraction, they are more likely to be aggressive and dangerous.  And because Calhoun could not see Tavara's feet through the window, he was unable to tell whether the apparent emergency was real or contrived.  Hence, Calhoun acted reasonably in refusing to enter the segregation dormitory alone.

There is "no rule of constitutional law [that] requires unarmed officials to endanger their own safety in order to protect a prison inmate."[10]  Furthermore, officers "should be accorded wide-ranging deference in the . . . execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  *Whitley v. Albers*, 475 U.S. 312, 321–22 (1986) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).

> That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline.  It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice.

*Id.* at 322.  Accordingly, the district court correctly held that Calhoun was not deliberately indifferent in waiting for support.  To conclude otherwise would create an unenviable Catch-22:  Either enter the cell alone and risk potential attack, or take appropriate precautions and incur liability under § 1983.  The

---

[9] Each officer in this case has previously encountered an inmate who had feigned a suicide attempt.

[10] *Longoria v. Texas*, 473 F.3d 586, 594 (5th Cir. 2006); *see also Carrothers v. Kelly*, 312 F. App'x 600, 602 (5th Cir. 2009) (per curiam).

No. 18-50194

Constitution does not place officials in that quandary.

Arenas counters that such security concerns are largely illusory and hyperbolic. After all, Tavara was a diminutive man with no incarcerations, gang affiliation, or violent disciplinary history. Conversely, Calhoun stood six inches taller and outweighed Tavara by thirty pounds. Arenas suggests that, clad in a stab-proof vest and armed with pepper spray, Calhoun had little to fear from the smaller Tavara. What's more, Tavara did not appear to have weapons, and all the other inmates were securely locked in their cells. Consequently, Arenas maintains that *Longoria*, 473 F.3d at 594, and *Carrothers*, 312 F. App'x at 602, are inapposite because both involved unarmed officers who reasonably refused to intervene in altercations between armed inmates. Arenas opines that where, as here, an officer is armed, he must respond to an emergency even at his own peril.

Arenas's contention rests on the false predicate that Calhoun was well-acquainted with Tavara's temperament and physical aptitude. Yet before his shift, Calhoun had never interacted with Tavara and did not know why he had been placed in administrative segregation. It is thus irrelevant that Tavara lacked a violent criminal history, because Calhoun had no way of knowing that. Moreover, the size difference between Tavara and Calhoun did not obviate the risk of danger. In fact, Calhoun testified that he had witnessed inmates who, owing to their proficiency in martial arts, were more dangerous than they first appeared. Though Calhoun was equipped with a stab-proof vest and pepper spray, such implements are hardly a foolproof guarantee in a potentially lethal one-on-one encounter.

Arenas yet asserts that any justification for not entering the cell vanished with the arrival of Shelby and Haas. Even though the officers now enjoyed a three-to-one tactical advantage, they still did not enter the cell for

8

another two minutes.  Admittedly, part of that delay was from the negligence of the control room officer, who inadvertently handed Calhoun the wrong key.  But in any event, Calhoun did not "refuse[] to treat [Tavara], ignore[] his complaints, intentionally treat[] him incorrectly, or engage[] in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756 (quoting *Johnson*, 759 F.2d at 1238).  Calhoun did not know whether the suicide was real or a sham, and as discussed below, he followed GDOC protocol in entering the cell only after multiple officers were present and his supervisor had given the green light.  Under those circumstances, the district court properly concluded that Calhoun's decision to wait seven minutes before entering the cell did not constitute deliberate indifference.[11]

## B.

In an effort to convince us otherwise, Arenas presents a plenitude of cases in which courts have denied summary judgment to officers who failed to anticipate a risk and to protect inmates from their known suicidal impulses.[12] Most notably, in *Jacobs* we affirmed the denial of QI where an officer had placed the detainee in a cell with tie-off points and a blind spot and had provided her a blanket and towel "even though he [had] kn[own] that those items should not be in the hands of a seriously suicidal detainee." *Jacobs*, 228 F.3d at 397.  If that oversight was sufficient to support a finding of deliberate indifference, Arenas reasons, then how much more is Calhoun at fault in

---

[11] *See Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001) (citing *Hare*, 74 F.3d at 645, 649) ("[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm.").

[12] *See, e.g., Snow ex rel. Snow v. City of Citronelle*, 420 F.3d 1262 (11th Cir. 2005); *Coleman v. Parkman*, 349 F.3d 534 (8th Cir. 2003); *Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001).

No. 18-50194

failing to intervene in an active suicide?

But *Jacobs* offers little guidance because it concerned an officer's role in preventing a future suicide, not in responding to an ongoing emergency. In contrast, whether Calhoun should have anticipated Tavara's suicide and taken measures to prevent it is not at issue. The district court held that Calhoun did not know Tavara was suicidal before that evening, and Arenas does not challenge that ruling on appeal.

Of the circuit cases that involved an active suicide, Arenas identifies only one from this court. In *Grogan v. Kumar*, 873 F.3d 273, 279–80 (5th Cir. 2017), we vacated summary judgment for the defendants where an inmate had attempted suicide by overdosing on medication. Though he had lain on the floor for two days—"not able to eat, drink, [or] walk, and barely able to talk"— he had ostensibly "received no help." *Id.* at 276. One nurse had allegedly walked by him and said she "didn't care," while another defendant had merely told him to "[s]leep it off." *Id.*

*Grogan* is readily distinguishable. Unlike the defendants there who had allowed the inmate to languish for two days, Calhoun immediately called for backup and entered the cell within minutes. Equally important, *Grogan* did not address the obvious security risks at the heart of this case. Indeed, the defendants did not appear concerned for their safety, given that they had allegedly walked by the inmate but refused to help. *Id.* That is not so here.[13]

---

[13] Arenas's reliance on *Fielder v. Bosshard*, 590 F.2d 105 (5th Cir. 1979), and *Herrin v. Treon*, 459 F. Supp. 2d 525 (N.D. Tex. 2006), is likewise misplaced. In *Fielder*, we affirmed a verdict of deliberate indifference where four officers had ignored an inmate's clear physical symptoms and repeated requests to see a doctor. *See Fielder*, 590 F.2d at 107–08; *see also McCoy v. Tex. Dep't of Criminal Justice*, No. C-05-370, 2006 WL 1788428, at *5 (S.D. Tex. June 26, 2006) (withholding QI where an officer had "waited over [ten] minutes before taking *any* action" in response to an inmate's fatal asthma attack "even though as many as six officers and a nurse were present at the scene").

No. 18-50194

Arenas next invokes an array of out-of-circuit precedent that, she claims, contravenes the judgment. But again, most of those cases either did not involve the security risks implicated here or questioned an officer's failure to summon timely medical support.[14] Still others addressed circumstances—not present here—in which an officer had himself created the medical emergency yet dawdled in proffering aid.[15]

Perhaps the strongest case supporting Arenas's position is *Estate of Miller ex rel. Bertram v. Tobiasz*, 680 F.3d 984 (7th Cir. 2012). The court found a plausible claim of deliberate indifference where officers had allegedly waited four minutes "to assemble an entry team and then applied restraints before removing the ligature from around [the prisoner's] neck." *Id.* at 991, 993. But

---

Additionally, the district court in *Herrin* denied QI based on the factual inconsistencies in the record that could have led a jury to find deliberate indifference. *See Herrin*, 459 F. Supp. 2d at 538. Those inconsistencies included at what point (1) the guards first saw a noose around the inmate's neck; (2) a call for a supervisor was made; (3) a supervisor arrived; and (4) guards entered the cell. *Id.* Conversely, the factual record here is not in dispute: Calhoun immediately sounded the alarm upon observing the noose.

[14] *See Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1082 (9th Cir. 2013) (where two officers trained in CPR entered a cell, yet for five minutes did not administer aid to cut down inmate in obvious medical need); *Bradich ex rel. Estate of Bradich v. City of Chicago*, 413 F.3d 688, 691 (7th Cir. 2005) (where three officers entered a cell and spent ten minutes "altering their log books and tidying the cell to disguise their violations of required procedures" before calling for medical assistance); *Olson v. Bloomberg*, 339 F.3d 730, 734, 738 (8th Cir. 2003) (where an officer encouraged the inmate to commit suicide, left the catwalk, and refused to return for up to twenty-five minutes despite prisoners' cries for help); *Ellis v. Washington County & Johnson City*, 198 F.3d 225, 228–29 (6th Cir. 1999) (where an officer saw an inmate tie a noose but waited ten minutes to notify other jailers and eleven minutes to summon medical assistance); *Heflin v. Stewart County*, 958 F.2d 709, 713 (6th Cir. 1992) (where two officials entered dormitory but left the inmate "hanging for twenty minutes or more . . . even though the body was warm and his feet were touching the floor"); *see also Tlamka v. Serrell*, 244 F.3d 628, 631, 633 (8th Cir. 2001) (where three CPR-trained officers failed to resuscitate incapacitated prisoner for ten minutes and ordered nearby inmates to stop administering CPR).

[15] *See Estate of Booker v. Gomez*, 745 F.3d 405, 431–32 (10th Cir. 2014); *Bozeman v. Orum*, 422 F.3d 1265, 1271–73 (11th Cir. 2005) (per curiam), *abrogated on other grounds by Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015); *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 599–601, 603 (6th Cir. 2005).

No. 18-50194

the court did not account for the apparent risks of entering a cell alone, perhaps because it appears that before the entry team arrived, a prison official had already entered the cell, or otherwise had access to the inmate's body, such that he was able to detect the lack of a pulse or breathing.[16] The dissent maintained that "[b]ecause the alleged time period between the emergency radio call and the response team's entry into [the inmate's] cell was so short, and the officers' alleged actions that caused the minor delays were . . . necessary to ensure the officers' (and [the inmate's]) safety," the plaintiff did not "plead sufficient facts . . . [to] show that the response team officers failed to take reasonable steps to prevent [the] suicide." *Id.* at 994 (Manion, J., dissenting in part).

The Sixth Circuit reached a similar conclusion in *Rich v. City of Mayfield Heights*, 955 F.2d 1092 (6th Cir. 1992). That case concerned an officer's decision to leave an inmate hanging for about a minute while the officer summoned paramedics and two other officers. *Id.* at 1094. "Because medical care was summoned promptly, [the inmate's] constitutional rights were not violated." *Id.* at 1097. In granting QI, the court observed "[n]o case . . . which recognizes a constitutional duty on the part of jail officials to immediately cut down a prisoner found hanging in his or her cell." *Id.* (citations omitted). That reasoning is convincing: The Constitution does not require an individual officer to intervene immediately in an apparent suicide without sufficient support where doing so would jeopardize his own safety. *See Longoria*, 473 F.3d at 594.

## C.

To be sure, a knowing failure to execute policies necessary to an inmate's safety may be evidence of an officer's deliberate indifference.[17] Arenas posits

---

[16] *See Estate of Miller by Bertram v. Michlowski*, No. 10-CV-807-WMC, 2011 WL 13187071, at *3 & n.2 (W.D. Wis. Sept. 29, 2011).

[17] *See, e.g., Estate of Pollard v. Hood County*, 579 F. App'x 260, 265 (5th Cir. 2014) (per

that Calhoun flouted SOP VG68-0001, which "appl[ies] to all State Institutions" and requires an officer to "call for backup by radio or telephone and then immediately cut down the hanging inmate . . . and initiate CPR procedures." GA. DEP'T OF CORR., *supra*, at 1, 12. At deposition, both Shelby and Dickson stated that an officer must comply with that policy. Additionally, Arenas's expert, Raul Banasco, testified that a correctional officer must provide immediate medical care to any inmate attempting suicide. Hence, as proof of deliberate indifference, Arenas asserts that Calhoun violated GDOC policy by refusing to enter Tavara's cell immediately.

That argument is unpersuasive. SOP VG68-0001 pertains to the functional area of "Program Services/Health Services—Mental Health" and is entitled "Managing Potentially Suicidal, Self-Injurious and Aggressive Behavior." *Id.* at 1. The express purpose of the policy is that "inmates . . . who are potentially suicidal, self-injurious, and/or physically aggressive will be *identified*, and *referred* for further evaluation and/or appropriate stabilization/management." *Id.* (emphasis added). Indeed, SOP VG68-0001 delineates the procedure for recognizing potentially suicidal and self-injurious inmates and the manner for housing and monitoring them. *Id.* at 3–12. It then concludes with a section on "Emergency Response" on which Arenas here relies. *Id.* at 12. As the GDOC Director of Operations, Steve Upton, clarified, however, that section applies only to inmates who have been identified as potentially suicidal or self-injurious, and, based on such identification, have been placed in a

---

curiam) ("[I]n some cases, failure to execute a plan to prevent against a detainee's suicide may amount to deliberate indifference."); *Tafoya v. Salazar*, 516 F.3d 912, 919 (10th Cir. 2008); *Goka v. Bobbitt,* 862 F.2d 646, 652 (7th Cir. 1988). *But see Doe v. Robertson*, 751 F.3d 383, 391 & n.10 (5th Cir. 2014) (quoting *Hostetler v. Green,* 323 F. App'x 653, 658 n.2 (10th Cir. 2009) (Gorsuch, J.)) (finding no law clearly establishing that a "[policy violation] alone is sufficient to create an inference of deliberate indifference"); *Jacobs*, 228 F.3d at 398 (holding that an officer's failure to check suicidal detainees every fifteen minutes according to prison policy "evince[d] at best, negligence" that was not actionable under § 1983).

designated stabilization unit.    Upton's understanding of the scope of SOP VG68-0001 is not only reasonable but is likely the better reading of the policy in light of its structure, text, and stated purpose.

Tavara was neither identified as potentially suicidal nor assigned to a stabilization unit.    Rather, he was housed in administrative segregation. Therefore, it was reasonable that Calhoun did not implement the procedures outlined in SOP VG68-0001.  And though Banasco urged that an officer must always intervene in a suicide, he did not purport to interpret GDOC protocol. Arenas has therefore failed to show that SOP VG68-0001 is evidence of any deliberate indifference on Calhoun's part.

For administrative segregation units at Smith State Prison, the *de facto* practice required at least two officers to be present to open a cell door.  More-over, officers were trained to defer to a supervising official to determine when it was safe to enter a cell.  That security protocol applied even where an officer discovered an inmate who appeared to be unconscious or engaged in self-harm. Violating that policy could subject an officer to discipline or liability if the inmate were to injure other officers or prisoners.

Calhoun faithfully adhered to operating procedure.  Even though Tavara appeared to be at risk of serious harm, GDOC policy prohibited Calhoun from entering an administrative segregation cell alone.  He thus immediately called for backup and retrieved the dormitory key awaiting his colleagues' arrival. Once Shelby appeared, Calhoun properly deferred to the supervising officer to direct when it was safe to open the door.  As soon as Dickson gave the order, Calhoun promptly assisted in removing Tavara from the noose and in admin-istering CPR.  Although an officer's compliance with prison policy by no means immunizes his actions from liability under § 1983, it militates against a finding

No. 18-50194

of deliberate indifference.[18]    Accordingly, Calhoun did not "effectively dis-regard[]" the known risk that Tavara might commit suicide.  *Jacobs*, 228 F.3d at 396 (citing *Farmer*, 511 U.S. at 846–48).

    The summary judgment is AFFIRMED.

---

[18] *See Jacobs*, 228 F.3d at 398 (concluding that "no reasonable jury could find that [an officer had] . . . acted with deliberate indifference" in following orders that "were not facially outrageous"); *see also Montoya-Ortiz v. Brown*, 154 F. App'x 437, 439 (5th Cir. 2005) (per curiam) (holding that a prison nurse was not deliberately indifferent to a prisoner's foot injury in following the orders of an independent contractor physician).