# SUPREME COURT OF THE UNITED STATES

PATSY K. COPE, ET AL. *v.* LESLIE W. COGDILL, ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 21–783.   Decided June 30, 2022

The petition for a writ of certiorari is denied.

JUSTICE SOTOMAYOR, dissenting from the denial of certiorari.

Jail officials placed Derrek Monroe, a pretrial detainee whom they knew to have twice recently attempted suicide by strangulation, in a cell with a 30-inch telephone cord, an obvious ligature, contrary to statewide guidance and at least one official's training. The lone jailer on duty then watched for approximately 10 minutes as Monroe wrapped the cord tightly around his neck and grew motionless. The jailer had neglected to call 911, despite having been specifically trained to do so. Monroe died the next day. The Fifth Circuit concluded that the jail officials were entitled to qualified immunity. I disagree and would summarily reverse.

I

The facts and circumstances surrounding Monroe's suicide are not in dispute. Monroe was arrested on a suspected drug offense and booked at a county jail. During intake, he stated on a screening form that he "'wished [he] had a way to'" kill himself that day. 3 F. 4th 198, 202 (CA5 2021). The form also reported that he had attempted suicide two weeks earlier, had received psychiatric services, had been diagnosed with "'some sort of schizophrenia,'" and displayed other signs of mental illness and emotional disturbance. *Ibid.* This information was relayed to Sheriff Leslie Cogdill and jail administrator Mary Jo Brixey. Brixey placed Monroe on a temporary suicide watch.

The following day, Monroe had a medical incident that required treatment at a local hospital. After receiving treatment, he was returned to the jail and placed in a cell with other inmates. Almost immediately, he twice attempted suicide by strangulation. He first tried wrapping a blanket around his neck, and after that did not work, he climbed atop the cell's toilet, tied a cloth to a fixture, and tried to hang himself by jumping off. Jailer Jessie Laws witnessed both attempts.

Respondents Cogdill and Brixey decided to relocate Monroe to an isolation cell, contrary to Cogdill's training as a sheriff, which instructed that isolating a suicidal detainee was dangerous and disfavored. Worse, Monroe's isolation cell contained an obvious risk for suicide by strangulation: a telephone mounted to the wall with a 30-inch telephone cord. The decision to place him in a cell with a ligature of that length contravened guidance issued two years earlier by the Texas Commission on Jail Standards in a memorandum addressed to all sheriffs and jail administrators. The memorandum specifically addressed telephone cords, recounting that four suicides involving telephone cords had occurred in Texas jails in the span of 11 months and advising that all telephone cords should be 12 inches or shorter in length.

Jail surveillance video captured what happened the next morning. Laws escorted Monroe to the shower and back to his cell. Once confined in his cell, Monroe began acting erratically and was visibly upset: He overflowed the toilet in his cell, began beating the toilet with a plunger, and slammed the telephone receiver against the wall. He then wrapped the telephone cord tightly around his neck several times, all while Laws watched through the bars of the cell.

Jail policy prohibited jailers from entering a cell when backup personnel were not present. Although Laws was specifically trained to call emergency medical services immediately in such circumstances, and jail policy required

him to do so, he did not call 911. When later asked why, he responded, "'Honestly, I don't know.'" *Id.*, at 214 (Dennis, J., dissenting). Instead, Laws called his supervisors, Cogdill and Brixey, who were off duty and off premises and therefore unable to respond quickly.

A minute or two after Monroe began strangling himself, his body stopped moving. For the next five minutes, Laws stood outside Monroe's cell, peering into the cell several times and checking his watch. Brixey arrived at the jail about 10 minutes after Monroe began strangling himself, and Laws unlocked the cell and unwrapped the cord from Monroe's neck. Neither Laws nor Brixey attempted to resuscitate Monroe. Brixey eventually left to call emergency medical services, which arrived approximately five minutes after Brixey called (and approximately 16 minutes after Monroe first wrapped the cord around his neck). Monroe still had a pulse and emergency medical services began performing chest compressions on their arrival. Monroe died in the hospital the following day.

Petitioner Patsy Cope, Monroe's mother, sued respondents in Federal District Court, alleging that they violated the Due Process Clause of the Fourteenth Amendment by acting objectively unreasonably in their treatment of Monroe and denying him appropriate medical care, despite being aware of the risk that he would commit suicide in an isolation cell with a 30-inch telephone cord. The officers moved for summary judgment, arguing that they were entitled to qualified immunity; the District Court disagreed and held that disputes of material fact precluded summary judgment.

Over a vigorous dissent by Judge Dennis, the Fifth Circuit reversed. As to respondent Laws, the Fifth Circuit concluded that "at the very least," petitioner presented sufficient evidence to create a genuine dispute of material fact as to whether Laws had subjective knowledge of the risk of

serious harm, given that Laws had witnessed Monroe attempt suicide by strangulation the previous day. *Id.*, at 207–208. The court also concluded that watching an inmate attempt suicide while failing to call emergency medical services was "both unreasonable and an effective disregard for the risk to Monroe's life," especially where jail policy did not permit Laws to enter the cell to assist until backup personnel arrived. *Id.,* at 209. The court held, however, that the law was not clearly established and that Laws' failure to act was not "so extreme" as the allegations this Court reviewed in *Taylor* v. *Riojas*, 592 U. S. ___ (2020) (*per curiam*). 3 F. 4th, at 209–210.

The Fifth Circuit also held that respondents Cogdill and Brixey were entitled to qualified immunity on petitioner's claim that they were deliberately indifferent by housing Monroe in a cell containing a lengthy telephone cord that a suicidal detainee easily could use to strangle himself. The court acknowledged that Brixey had placed Monroe on a temporary suicide watch and that Cogdill was aware that Monroe had attempted suicide by hanging the day before. But the court concluded that there was no evidence that any inmate at the facility had previously attempted suicide by strangulation with a telephone cord, nor that Brixey and Cogdill were aware of this danger. The court acknowledged that it had previously held that officers were not entitled to qualified immunity when they gave suicidal inmates bedding or blankets. *Id.*, at 210–211 (citing *Jacobs* v. *West Feliciana Sheriff 's Dept.*, 228 F. 3d 388, 390, 396 (CA5 2000), and *Converse* v. *Kemah*, 961 F. 3d 771, 773–774 (CA5 2020)). In the court's view, however, the dangers posed by a telephone cord were "not as obvious as the dangers posed by bedding." 3 F. 4th, at 210–211. The court therefore concluded that holding Monroe in a cell containing a 30-inch telephone cord, unlike holding him in a cell containing a blanket, did not violate a clearly established constitutional right.

SOTOMAYOR, J., dissenting

## II

I would summarily reverse the Fifth Circuit's qualified-immunity determinations as to all three respondents. It is well established that "[q]ualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau* v. *Haugen*, 543 U. S. 194, 198 (2004) (*per curiam*). This Court has repeatedly held, nevertheless, that "'a general constitutional rule . . . may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful.'" *Hope* v. *Pelzer*, 536 U. S. 730, 741 (2002) (quoting *United States* v. *Lanier*, 520 U. S. 259, 271 (1997); brackets and some internal quotation marks omitted); see also *Taylor*, 592 U. S., at \_\_\_ (slip op., at 2).

Here, respondent Laws offered no explanation for his failure to call 911 immediately, or at any other point as he watched Monroe strangle himself and become motionless. Had Laws called for medical help immediately, emergency medical services might have arrived with enough time to save Monroe's life; indeed, they arrived only five minutes after they were finally summoned.* Instead, Laws waited until an off-duty and off-premises supervisor arrived, wasting precious minutes that might have been the difference between life and death. No reasonable officer would have stood and watched as a detainee strangled himself to death

_____

*Brain death generally occurs four to five minutes after strangulation begins. See California District Attorneys Association and Training Institute on Strangulation Prevention, C. Gwinn & G. Strack, The Investigation and Prosecution of Strangulation Cases 1 (2013), https:// evawintl.org/wp-content/uploads/California-Strangulation-Manual_web3. pdf; NYC Mayor's Office to Combat Domestic Violence, Strangulation Reference Guide 1, https://www.courts.ca.gov/documents/BTB25-PreConDV-05.pdf. Remarkably, however, Monroe survived 16 minutes of strangulation, only to die the next day at the hospital.

when a simple, safe, and patently obvious response was available and in fact required by jail policy and Laws' specific training. Laws' failure to call emergency medical services was an inexplicable and unreasonable decision that, under any standard, clearly constituted deliberate indifference to Monroe's life-or-death medical needs. Accordingly, Laws was not entitled to qualified immunity.

The Fifth Circuit's conclusion that respondents Cogdill and Brixey were entitled to qualified immunity is equally erroneous. It is undisputed that these respondents were aware of Monroe's risk of suicide. Brixey and Cogdill knew Monroe had twice attempted suicide by strangulation just the day before, that he had expressed a desire to kill himself when he was admitted to the jail, and that he had attempted suicide on another occasion two weeks earlier. Placing him alone in a cell containing a readily accessible ligature, a 30-inch telephone cord, violated the Constitution in a manner that would have been "obvious" to any reasonable officer. *Hope*, 536 U. S., at 740–741. That decision violated Cogdill's training as to the risks of placing suicidal detainees in isolation cells. It also broke with the Texas Commission on Jail Standards' guidance, which specifically warned of the dangers telephone cords posed to suicidal inmates and advised that telephone cords should be 12 inches or shorter. Respondents Brixey and Cogdill were not entitled to qualified immunity for their deliberate indifference to the risks to which they subjected Monroe.

\* \* \*

This Court cannot and should not correct every error that comes before it. But "summary dispositions remain appropriate in truly extraordinary cases involving categories of errors that strike at the heart of our legal system." *Andrus* v. *Texas*, 596 U. S. ___, ___ (2022) (SOTOMAYOR, J., dissenting from denial of certiorari) (slip op., at 24). This is such a

case. It involves a mother seeking some measure of recompense for the tragic and unnecessary death of her son. On the uniquely troubling facts of this case, a jury should decide whether Cogdill and Brixey acted with deliberate indifference for housing Monroe in a cell with an instrument that predictably facilitated his suicide, and whether Laws likewise was deliberately indifferent for watching Monroe strangle himself but failing to contact emergency services promptly. I respectfully dissent from the Court's refusal to summarily reverse.